OPINION
{¶ 1} Defendant-appellant, Joseph Bennett ("Bennett"), appeals from the judgment of the Ashtabula County Court of Common Pleas, on a jury verdict convicting him of Murder, in violation of R.C. 2903.02(A), a felony of the first degree, and Felony Murder (felonious assault), in violation of R.C. 2903.02(B), a felony of the first degree. We affirm Bennett's conviction.
 {¶ 2} On Saturday, June 9, 2001, at approximately 4:30 a.m., Sergeant Randy Poore ("Poore") of the Conneaut Police Department, received a dispatch that a man was discovered lying in the middle of Madison Street in Conneaut, Ohio. When Poore arrived, he found the man lying dead, without shoes, in the middle of the street. The man, who had been stabbed repeatedly, had a considerable amount of blood pooled underneath him, and a blood trail leading from the sidewalk in front of the former St. Mary's School Building ("St. Mary's Hall"), out to where the man lay in the roadway. The victim was subsequently examined by Richard Mongell, ("Mongell"), an investigator for the Ashtabula County Coroner's Office, and identified as Sam Kosik ("Kosik"), by means of a tag on his uniform pants, and his driver's license, which was found on his person.
 {¶ 3} Shortly thereafter, police and fire units arrived, and conducted an extensive search of the surrounding area. Pursuant to this search, police recovered a cordless telephone on the east side of St. Mary's Hall, and a knife from the tree lawn in front of St. Mary's Hall, east of where Kosik's body was found.
 {¶ 4} Police learned from Kosik's brother that Kosik may have been at an apartment on 218 Chestnut Street, less than 900 yards from where they found Kosik's body. The Chestnut Street apartment was the residence of Dorothy Bennett ("Dorothy"), the former wife of Joseph Bennett.
 {¶ 5} Between 8:30 and 9:00 a.m., Conneaut police officers, including Poore, and Detectives Terry Moisio, Sr. ("Moisio") and Steven Gerics ("Gerics") were sent to Dorothy's apartment. Upon arrival, Moisio and Gerics made contact with Dorothy. Dorothy was there with her two-year-old daughter, Tessa Bennett ("Tessa"), who was asleep on a small mattress in the living room.
 {¶ 6} Detective Moisio was the first to interview Dorothy. The initial interview lasted over thirty minutes. During the course of this interview, Moisio, who was trained in kinesic interviewing, an observational interviewing technique, described Dorothy's demeanor as "very scared, very nervous." Moisio asked Dorothy if she knew Kosik and if he had been at her apartment. Dorothy responded in the affirmative to both questions. Moisio noticed some men's shoes in the living room and asked Dorothy about them. Dorothy told Moisio that the shoes belonged to Kosik. Moisio then asked Dorothy if she was aware of Kosik's current whereabouts. Dorothy told Moisio that she was not aware of Kosik's whereabouts.
 {¶ 7} During the interview, Moisio asked Dorothy where she was from, and Dorothy told him that she was originally from Ashtabula, but had moved to Conneaut to get away from her ex-husband during their divorce because she was afraid of him. When Moisio asked her why she was afraid of him, Dorothy stated that he had threatened her and she was afraid that he was going to kill her and harm Tessa or have Tessa taken away.
 {¶ 8} Dorothy subsequently consented to a search of her apartment. Among the items taken into evidence from the apartment were Kosik's shoes and keys, and the base for the cordless phone that had been found on the St. Mary's grounds. Upon later investigation, Gerics determined that the last number dialed on this phone was 911, which rang to the Conneaut Police Department dispatcher.
 {¶ 9} Over the ensuing months of the investigation, Moisio had several additional conversations with Dorothy regarding the event, because he felt that she had information about Sam Kosik and that she was "hiding something back." Each time they talked, Dorothy would give him a little bit more information, some of which was inconsistent with her original statement, but Moisio continued to believe that Dorothy never told him everything she knew. During the period leading up to the trial, Dorothy continued to speak to representatives of different police agencies, including the FBI, and to representatives of the prosecutor's office, each time giving more detail of the events of that night.
 {¶ 10} At approximately 8:30 a.m., on June 9, 2001, after a call from the Conneaut police, Ashtabula City police officers were dispatched to the Woodman Avenue Trailer Park, located on 5650 Woodman Avenue in Ashtabula, to look for Joseph Bennett. Officer Aaron Greenberg ("Greenberg") was the first to arrive. Upon arrival, Officer Greenberg went to the rear of #63, Woodman Trailer Park, where he observed Bennett working on the engine of a gray Mazda pickup truck. The doors of the truck were open, and the inside had a fresh coating of Armor-All on it.
 {¶ 11} Bennett was arrested and searched. Greenberg found two folding knives in Bennett's pockets. Bennett asked what was going on, and Greenberg told him to just be quiet. In the meantime, other officers from the Ashtabula Police Department arrived to secure the scene. Bennett was Mirandized and taken to the Ashtabula police station. At that time, Greenberg advised him that members of the Conneaut Police Department would be arriving to speak with him.
 {¶ 12} At 9:58 a.m., on June 9, 2001, Lt. Robert Zimmerman ("Zimmerman") of the Conneaut Police Department arrived to interview Bennett. Zimmerman testified that when he first encountered Bennett, Bennett had red bloodshot eyes and was very "nervous looking." During the course of the interview, which lasted approximately three hours, Bennett was allowed to take numerous bathroom breaks, and at least two cigarette breaks. Zimmerman initially told Bennett that he was brought in to answer some questions related to an "assault" on Kosik that occurred in the vicinity of his exwife's residence. Bennett was then read his Miranda rights again and signed a waiver thereof and submitted to questioning. Approximately an hour after the questioning began, Bennett gave a written statement. Zimmerman testified that Bennett was not told until later during the interview that Kosik was dead.
 {¶ 13} In his statement, Bennett said that after finishing his shift at Ashtabula Rubber at approximately 11:10 p.m., June 8, 2001, he stopped to buy some cigarettes and a bottle of pop, and went over to his parents' house. While at his parents' home, he changed from a pair of black shorts into a pair of jeans. Bennett said that he stayed at his parents' home until approximately 2:30 a.m., and then put the clothes he had been wearing in the truck, and then left to go to the Flying J truck stop on Route 45 to get something to eat. About a mile away from the truck stop, Bennett decided that he was too tired to go any further and so he turned around in the parking lot of the First Assembly of God Church, and returned to his home, a distance of approximately ten miles.
 {¶ 14} Zimmerman testified that, during questioning, Bennett told him that when he returned home, at some time between 3:00 and 3:30 a.m., he had a glass of juice and a cigarette, brushed his teeth, and went to bed. He awakened at around 8:15 a.m., and went outside to clean out the inside of his brother's truck, which he had been driving because his own truck had been disabled for several weeks, and that is what he was doing when the police came shortly thereafter. When Zimmerman asked him why he was cleaning out the truck, Bennett stated that his father, who lived across the street from him, had been yelling at him to clean out the inside of the truck because of all the cigarette ashes. Bennett stated that he added a quart of oil to the truck, and had removed all of the larger trash from inside the truck and placed it into a garbage bag, and that he had used Armor-All to clean the inside of the driver's door and the dashboard.
 {¶ 15} When questioned by Zimmerman as to whether he had a knife collection, Bennett stated that he had a knife collection hanging on the wall of his home, and in addition, owned 15-20 pocket knives. When asked whether he carried knives in his truck or on his person, Bennett stated that he does carry knives ordinarily. At trial, Scott Sutch, a co-worker of Bennett's, testified about a particular knife that Bennett carried with him "all the time," a black handled, switch blade knife, with a scrimshaw design on it. This knife was never recovered by the police.
 {¶ 16} At 12:28 p.m., Bennett was re-Mirandized and granted the police permission to search his truck and his mobile home. Sometime after 1:00 p.m., Poore and Moisio were sent to Ashtabula to search Bennett's vehicles and his home, but no evidence was taken as a result of this initial search. When Poore reported back, Zimmerman was still questioning Bennett. At this time, Poore noticed a red spot on Bennett's jeans, which were subsequently taken into evidence. The spot was later found to be Bennett's own blood. Zimmerman testified that when Bennett removed his jeans, he did not observe any marks on Bennett's body.
 {¶ 17} On June 11, 2001, pursuant to a search warrant, Conneaut police, including Poore and Zimmerman, again searched Bennett's trailer. They recovered several items from the trailer which were subsequently tested by personnel in the Cuyahoga County Coroner's Trace Evidence Department, among them, an assortment of knives; a pillow, which had some blood on it, later determined to be Bennett's own blood; and some laundry taken from his clothes dryer. The knives taken into evidence were all tested for blood and other trace evidence, but nothing of significance was found.
 {¶ 18} During the course of the investigation, the police also retraced the route that Bennett said he took that night. When the police arrived at the First Assembly of God Church, they noticed that there was a large pond on the grounds. On June 15, 2001, after receiving permission from church officials, Conneaut police searched the pond with divers recruited from several agencies. No evidence was recovered as a result of this search. On the same date, the police again searched the apartment at 218 Chestnut, which had been sealed since the date of the incident, pursuant to a search warrant. As the result of this search, a drain trap was removed from the sink in the upstairs bathroom. The trap was subsequently tested, and no blood was found. Despite the extent of police efforts, the prosecution admitted during trial that no murder weapon was ever found.
 {¶ 19} On December 12, 2001, an indictment was filed, charging Bennett with one count of Aggravated Murder, in violation of R.C. 2903.01(A), one count of Murder, in violation of R.C. 2903.02(A), and one count of Felony Murder, in violation of R.C. 2903.02(B). Bennett subsequently entered a plea of not guilty to the charges. On February 20, 2002, a seven day jury trial commenced.
 {¶ 20} At trial, Dorothy testified that she fell asleep on the couch at about 1:00 or 2:00 a.m., on June 9, 2001 and awakened to the sound of Bennett and Kosik arguing in the living room of her apartment. Dorothy testified that Bennett, "wanted to take Tessa and Sam wouldn't let him." Dorothy said that the two men started to get louder, and she became upset because Tessa was starting to wake up. Dorothy testified that she tried to get them to calm down, and Bennett struck her on the face. Kosik then became angry and suggested that they go outside. From the living room, Dorothy looked out the window and saw the two arguing back and forth on the front porch, at which time, she saw "Joe swipe at Sam" with "something shiny," at which point she saw "Sam jump back and go towards the road," with "Joe following him." Dorothy then testified that she quickly checked to see if Tessa went back to sleep, grabbed the phone, and headed out the door looking for them. She looked down both directions of Route 20 and did not see them, so she went toward the St. Mary's Hall. As she reached the edge of the building, she saw Bennett stab Kosik, and Kosik fall to his knees. Dorothy testified she dialed 911 and then, when Bennett looked at her, she dropped the phone and ran back home to Tessa.
 {¶ 21} Dorothy also testified that, a short time later, Bennett returned to the apartment with blood on his right hand. Dorothy said that when Bennett came in, he told her not to tell anybody that he had been there or he would "take and hurt" Tessa, and that if he did not take her, the "State would," for leaving Tessa alone in the house, and that "he would kill her." Dorothy then testified that Bennett went upstairs, and she heard water running. When Bennett came back downstairs, he told Dorothy to "remember what I said," and left. When asked why she did not call the police, Dorothy stated that she believed what Bennett had told her and she was afraid that she would lose Tessa.
 {¶ 22} Based principally on Dorothy's eyewitness account of the murder, the jury returned with a verdict of guilty on counts two and three. Pursuant to R.C. 2941.25, Bennett's conviction on count three was then merged into count two, and he was subsequently sentenced to a term of 15 years to life in prison. Bennett now timely appeals, asserting the following assignments of error on appeal:
 {¶ 23} "[1.] The trial court abused its discretion and erred to the prejudice of the appellant when it admitted into evidence, evidence which was not relevant or the probative value of which was substantially outweighed by the danger of unfair prejudice, confusion of the issues, or of misleading the jury.
 {¶ 24} "[2.] The verdict of the jury was against the manifest weight of the evidence and the trial court erred to the prejudice of appellant when it accepted the jury's verdict of guilty to counts two and three of the indictment.
 {¶ 25} "[3.] The appellant was deprived of the effective assistance of counsel guaranteed him by the sixth and fourteenth amendments to the United States Constitution and Article I, Section 10 of the Constitution of the State of Ohio.
 {¶ 26} "[4.] The cumulative errors made by the trial court, and trial counsel's rendering of ineffective assistance of counsel, denied the appellant a fair trial.
 {¶ 27} "[5.] The trial court committed plain error by failing to suppress appellant's statements to police.
 {¶ 28} "[6.] The trial court committed plain error by failing to exclude hearsay testimony."
 {¶ 29} In the interest of judicial economy, these assignments of error will be discussed out of the order in which they were presented.
 {¶ 30} In his second assignment of error, Bennett maintains that the verdict of the jury was against the manifest weight of the evidence and the trial court erred to the prejudice of the appellant when it accepted the jury's verdicts of guilty on counts two and three of the indictment.
 {¶ 31} Bennett argues that there is no evidence, other than the testimony of Dorothy, upon which a jury could find that he was guilty beyond a reasonable doubt and that her testimony was thoroughly impeached through cross-examination. We disagree.
 {¶ 32} Bennett urges this court to utilize the eight factors outlined in State v. Mattison, (1985), 23 Ohio App.3d 10, as a means of attacking the inconsistencies in Dorothy's statements to the police over the course of the investigation and her trial testimony, in which she ultimately testified that she saw Bennett stab Kosik.
 {¶ 33} This court has repeatedly held that these factors are merely guidelines in considering a manifest weight argument, and has repeatedly deferred to the standards of review set forth by the Supreme Court of Ohio. See, State v. Elswick, 11th Dist. No. 2001-A-0035, 2002-Ohio-3365, at 37, citing State v. Harris (Apr. 10, 1998), 11th Dist. No. 96-T-5512, 1998 Ohio App. LEXIS 1540, at *8; State v. Alexander (Nov. 29, 1996), 11th Dist. No. 93-T-4948, 1996 Ohio App. LEXIS 5418, at *25 (citations omitted).
 {¶ 34} It is well-established in Ohio that the manifest weight of the evidence raises a factual issue. "The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of the witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Thompkins, 78 Ohio St.3d 380, 387,1997-Ohio-52, quoting State v. Martin (1983), 20 Ohio App.3d 172, 175. The concepts of sufficiency of the evidence and manifest weight of the evidence are distinct. "`Sufficiency' challenges whether the prosecution has presented evidence on each element of the offense to allow the matter to go to the jury, while `manifest weight' contests the believability of the evidence presented." State v. Schlee (Dec. 23, 1994), 11th Dist. No. 93-L-092, 1994 Ohio App. LEXIS 5862, at *13. "[T]he weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." State v. DeHass (1967), 10 Ohio St.2d 230, at paragraph one of the syllabus. However, when considering a weight of the evidence argument, a reviewing court "sits as a `thirteenth juror'" and may "disagree with the factfinder's resolution of the conflicting testimony." Tompkins, 78 Ohio St.3d at 387, citing Tibbs v. Florida
(1982), 457 U.S. 31, 42. "The only special deference given in a manifest-weight review attaches to the conclusion reached by the trier of fact." Id. at 390 (Cook J., concurring opinion).
 {¶ 35} We cannot find that the jury lost its way and created a manifest miscarriage of justice in convicting Bennett. In particular, the eyewitness testimony of Dorothy, who was subject to aggressive and rigorous cross-examination by defense counsel, was corroborated by other circumstantial evidence. Dorothy's eyewitness testimony is consistent with her cordless phone being found at the scene in the parking lot near St. Mary's Hall. Dorothy's testimony that she witnessed Bennett stab Kosik explains why the last number dialed on the phone was 911. Dorothy's testimony that Kosik "fell to his knees" once stabbed, is consistent with Mongell's testimony that Kosik had dirt on the knees of his pants and Dr. Felo's testimony of the abrasions to Kosik's knees and possibly to his face. Taken together, there was credible evidence to create a belief in the jury that Bennett was guilty beyond a reasonable doubt in the murder of Kosik. The jury also reasonably found the prosecution's witnesses were credible. We see no reason, therefore, to substitute our judgment for that of the jury. Bennett's second assignment of error is without merit.
 {¶ 36} As the first and sixth assignments of error relate to the trial court failing to exclude evidence, these two assignments of error will be discussed together.
 {¶ 37} In his first assignment of error, Bennett claims that the trial court abused its discretion and erred to his prejudice, by admitting into evidence a series of knives, over the objections of his counsel.
 {¶ 38} In his sixth assignment of error, Bennett argues that the trial court erred by not excluding hearsay testimony of Detective Moisio, as to what he was told by Dorothy, when she was not shown to be unavailable to testify at trial. Bennett claims this testimony included allegations that Bennett had previously assaulted Dorothy and thrown Tessa, and that the testimony was hearsay, contrary to Evid.R. 802, since it was being offered to prove the truth of the matter asserted. He further argues that the trial court's failure to exclude this testimony was plain error and prejudicial to his defense.
 {¶ 39} "Relevant evidence is `evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" State v. DeRose, 11th Dist. No. 2000-L-076, 2002-Ohio-4357, at ¶ 15, quoting Evid.R. 401. Generally, "relevant evidence is admissible, unless some other provision of law makes it inadmissible." Id, citing Evid.R. 402. Evidentiary rulings are within the discretion of the trial court and will not be overturned absent a clear abuse of discretion whereby the defendant has suffered material prejudice. Statev. Long (1978), 53 Ohio St. 2d 91, 98.
 {¶ 40} An abuse of discretion consists of more than an error of law or judgment. Rather, it implies that the court's attitude is unreasonable, arbitrary, or unconscionable. Berk v. Matthews (1990), 53 Ohio St.3d 161,169 (citation omitted). Reversal under an abuse of discretion standard is not warranted merely because appellate judges disagree with the trial judge or believe the trial judge erred. Id. Reversal is appropriate only if the abuse of discretion renders "the result * * * palpably and grossly violative of fact and logic [so] that it evidences not the exercise of will but perversity of will, not the exercise of judgment but defiance thereof, not the exercise of reason but rather of passion or bias." Statev. Jenkins (1984), 15 Ohio St.3d 164, 222 (citation omitted).
 {¶ 41} At trial, Dr. Joseph Felo ("Dr. Felo"), of the Cuyahoga County Coroner's Office, who performed the autopsy on Kosik, testified that the length of the knife used in the murder would have had to be a minimum of five inches long. Bennett argues that, since only three of the knives proffered by the State as evidence were longer than five inches, the admission of seventeen knives with blades shorter than five inches into evidence constituted an abuse of discretion by the trial court. Bennett alternatively argues that, even if all of the knives are deemed relevant under Evid. R. 402, they are otherwise inadmissible, because their probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.
 {¶ 42} At the close of the State's case-in-chief, the trial court held an in camera hearing to determine which exhibits would be submitted to the jury. There were no objections made to the testimony of Timothy Nock ("Nock") of the Cuyahoga County Coroner's Trace Evidence Department, who had testified about trace evidence tests he performed on each knife, but defense counsel did object to the admission of the knives themselves.
 {¶ 43} The trial judge, over the objection of defense counsel, admitted two knives found near the murder scene into evidence, despite the judge's recognition that these knives did not "connect up to the defendant in any way." The State had argued that these knives had a tendency to show the extent of the investigation, despite the discovery of no physical evidence linking Bennett to the murder. Since there was extensive testimony regarding the forensic analysis of these two knives, the trial judge admitted them.
 {¶ 44} We agree with Bennett that the trial judge erred by admitting the two knives found near the murder scene into evidence. According to Nock's testimony, both knives were tested for the presence of human blood, and none was found. Although the first knife was found near the scene of the murder on the day Kosik's body was discovered, it could not, in any way, be connected to Bennett. The second knife, an 8inch Ginsu, had no evidentiary value whatsoever, as this knife was not recovered until two months after the murder and could have been dropped in the area some time later.
 {¶ 45} The trial judge also admitted into evidence thirteen knives recovered from Bennett's trailer and truck, and two knives found in Bennett's pockets at the time of his arrest, since the trial judge believed they had a tendency to show that Bennett "was a knife collector," and "there is an inference that could possibly be drawn by the jury that he would have knives available to him and would be able to inflict these wounds."
 {¶ 46} We agree with Bennett that the judge erred by admitting these knives into evidence, since they do not have probative value of any fact of consequence to the determination of the action. While the admission of knives may be relevant in some limited cases to prove access to knives or specialized knowledge in the use of knives, such was not the case here. See, State v. Hartman, 93 Ohio St.3d 274, 281-282, 2001-Ohio-1580, (holding that the introduction of knives owned by defendant into evidence without objection was not plain error when defendant's ownership of a set of knives, and his familiarity with the use of knives at work was relevant to the surgically precise manner in which the knife was used to commit the murder.)
 {¶ 47} Nonetheless, we find the admission of these knives into evidence constituted harmless error. In determining whether an error is harmless, "[t]he question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction." State v. Murphy (May 3, 1984), 10th Dist. No. 82AP-989, 1984 Ohio App. LEXIS 9096, at *7 (citations omitted). In situations where the State never implies that a knife could have been the murder weapon or that it was in any way connected with the murder, the trial court's admission of the knife into evidence, even if erroneous, cannot reasonably contribute to a defendant's conviction. Id. at *8.
 {¶ 48} In the case at bar, the State unequivocally asserted throughout the course of the trial, that the knife used to murder Sam Kosik was never found. Moreover, there was sufficient evidence, in the eyewitness testimony of Dorothy alone, where a jury could find, beyond a reasonable doubt, that Bennett was guilty. The Supreme Court of Ohio has stated that, "[w]here evidence has been improperly admitted * * * the admission is harmless `beyond a reasonable doubt' if the remaining evidence alone comprises `overwhelming' proof of defendant's guilt." State v. Sage
(1987), 31 Ohio St.3d 173, 181. Such is the case here. This argument is, therefore, without merit.
 {¶ 49} Bennett next argues that the following testimony of Detective Moisio contained hearsay statements:
 {¶ 50} "Q: And did she [Dorothy] say why she had moved to Conneaut beyond get away from her ex- or soon-to-be ex-husband?
 {¶ 51} "A: She was afraid of her ex-husband. She said, afraid of her husband, Joe Bennett.
 {¶ 52} "Q: Did you ask her what she was afraid of?
 {¶ 53} "A: Yeah. She said that he had threatened her, that he was going to kill her and harm the baby or have the baby taken away."
 {¶ 54} Bennett claims that each statement made was contrary to Evid. R. 801(C), which defines hearsay as "a statement, other than one made by the declarant while testifying at trial or hearing, offered in evidence to prove the truth of the matter asserted." Hearsay is inadmissible at trial, unless it falls under an exception to the rules of evidence. Evid. R. 802.
 {¶ 55} Defense counsel made no objection to this testimony at trial, and therefore waived all but plain error. See, State v. Santiago, 10th Dist. No. 02AP-1094, 2003-Ohio-2877, at ¶ 11, (holding that failure to object to the introduction of hearsay evidence at trial waives all claims of error except for plain error). Pursuant to Crim. R. 52(B), a plain error or defect affecting substantial rights may be noticed, if not brought to the attention of the court. Long, 53 Ohio St. 2d, at 94. Plain error is to be invoked only in exceptional circumstances to avoid a miscarriage of justice. Id. at 95 (citation omitted).
 {¶ 56} The test for "plain error" is enunciated under Criminal Rule 52 (B). In order for Crim.R. 52(B) to apply, a reviewing court must find that (1) there was an error, i.e., a deviation from a legal rule; (2) that the error was plain, i.e., that there was an "obvious" defect in the trial proceedings; and (3) that the error affected "substantial rights," i.e., affected the outcome of the trial. State v. Barnes, 94 Ohio St.3d 21,27, 2002-Ohio-68 (citations omitted).
 {¶ 57} Bennett challenges, as inadmissible hearsay, the trial court's allowance of testimony by Moisio concerning Dorothy's statements to him that (1) appellant said he would kill Dorothy or take and harm Tessa, and (2) she was "afraid of Joe Bennett." In this case, both of these statements constitute hearsay and are inadmissible unless subject to a hearsay exception. While Bennett's threat that he would kill Dorothy or take and harm Tessa would have qualified as an admission if included in Dorothy's in court testimony, Moisio's testimony concerning that threat does not qualify under the admission exception because Moisio did not witness Bennett make that threat. Bennett's threat was hearsay (Moisio's testimony of what Dorothy said appellant said to her). Since the statement by Bennett came in through Moisio, and not Dorothy, the statement was inadmissible.
 {¶ 58} Moisio's testimony concerning Dorothy's statement to him that she moved because she was "afraid of Joe Bennett" also does not fall within an exception to the hearsay rule. While Evid.R. 803(3) provides an exception for "[a] statement of the declarant's then existing state of mind, emotion, sensation, or physical condition" (emphasis added), the operative words in that exception are "then existing." In this case, Dorothy told Moisio that she moved out because she was "afraid of Joe Bennett." This statement reflects Dorothy's fearful state of mind when she moved out, not her existing mental or emotional condition at the time she talked with Moisio. Dorothy's subsequent comment to Moisio concerning her state of mind at the time she moved out does not qualify as an exception under Evid.R. 803(3).
 {¶ 59} Nevertheless, in the instant case, the admission of the above statements does not rise to the level of plain error. The admission of this testimony, though erroneous, was not prejudicial to Bennett, since substantially similar statements were properly admitted in Dorothy's testimony, and she was subject to rigorous cross-examination on each. Moreover, as discussed earlier, there was ample evidence adduced at trial, absent Moisio's testimony, to find Bennett guilty beyond a reasonable doubt. Bennett's first and sixth assignments of error are without merit.
 {¶ 60} In Bennett's fifth assignment of error, he argues that the trial court committed plain error when it failed to suppress the statements he made during custodial interrogation, where the police employed deceit and trickery, by telling him that Kosik had only been the victim of an assault, despite their knowledge that Kosik was dead.
 {¶ 61} The United States Supreme Court, in Miranda v. Arizona (1966),384 U.S. 436, 444, held that the State may not use statements stemming from custodial interrogation, unless it demonstrates that procedural safeguards were taken to secure the defendant's privilege against self-incrimination. Among these safeguards are the Miranda warning, the right to end questioning at any time until an attorney is obtained, and an intelligent, knowing and voluntary waiver of this privilege. Id. Furthermore, the safeguards prescribed by Miranda become applicable as soon as a suspect's freedom of action is curtailed to a "degree associated with formal arrest." Berkemer v. McCarty (1984), 468 U.S. 420,440 (citation omitted). It is undisputed that Bennett was subject to custodial interrogation when he made his statements to Zimmerman, as he was handcuffed and Mirandized before being transported to the Ashtabula City Jail. Bennett argues that his waiver of Miranda warnings was not voluntary, as it was the result of police "deceit and trickery." We disagree.
 {¶ 62} In determining the voluntary nature of a waiver of Miranda
rights, a reviewing court will look at the "totality of the circumstances." State v. Gumm, 73 Ohio St.3d 413, 429, 1995-Ohio-24. In deciding whether a defendant's statement is voluntary, the trial court should consider the following factors: "the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement." State v. Worley, 11th Dist. No. 2001-T-0048, 2002-Ohio-4516, at ¶ 161.
 {¶ 63} While police deception may be relevant to the issue of whether a statement was the product of police coercion, courts have repeatedly held that deception on the part of the police in no way vitiates the voluntary nature of an otherwise valid statement. See, State v. Loza,71 Ohio St.3d, 61, 67-68, 1994-Ohio-409, (holding that defendant's confession was valid, despite the police falsely telling him that the victim was alive when all the other circumstances surrounding the confession indicated it was made voluntarily); State v. Campbell, (1994)69 Ohio St.3d 38, 46 (holding that waiver of Miranda was not involuntary where defendant thought he was to be interrogated about an unrelated rape charge, when he was subsequently questioned about a murder). In viewing the totality of the circumstances, we conclude that Bennett's statement was voluntary. His fifth assignment of error is without merit.
 {¶ 64} In Bennett's third assignment of error, he claims that he was deprived a fair trial by ineffective assistance of counsel.
 {¶ 65} "[T]he proper standard for attorney performance is that of reasonably effective assistance * * * [and] the defendant must show that counsel's representation fell below an objective standard of reasonableness." Strickland v. Washington (1984), 466 U.S. 668, 687-688. A court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689. Thus, a defendant "must overcome the presumption that, under the circumstances, the challenged action `might be considered sound trial strategy.'" Id, citing Michel v. Louisiana (1955), 350 U.S. 91, 101. "Debatable trial tactics generally do not constitute a deprivation of effective counsel." State v. Phillips, 74 Ohio St.3d 72, 85, 1995-Ohio-171.
 {¶ 66} "To establish prejudice, the defendant must show that there is a reasonable probability that, but for the counsel's unprofessional errors, the result of the proceeding would have been different." Statev. Seiber (1990), 56 Ohio St.3d 4, 11, citing Strickland, 466 U.S. at 687
("counsel's errors [must be] so serious as to deprive the defendant of a fair trial, a trial whose result is reliable"). "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." Strickland, 466 U.S. at 691.
 {¶ 67} Reversal of a conviction, therefore, places the burden on the defendant to show that counsel's deficient performance raises a reasonable probability that, but for counsel's errors, the result of the trial would have been different. See, State v. Bradley (1989),42 Ohio St.3d 136, 143; State v. Henderson, 11th Dist. No. 2001-T-0047, 2002-Ohio-6715, at ¶ 13 (citation omitted). In addition, "[t]here is a strong presumption in Ohio that a licensed attorney is competent. * * * [t]o overcome this presumption a defendant must show that the actions of his attorney did not fall within a range of reasonable assistance." Id. at ¶ 14 (citations omitted); Schlee, 1994 Ohio App. LEXIS 5862, at *31.
 {¶ 68} Bennett first argues that defense counsel's failure to object to Nock's testimony regarding tests performed a week before trial at the request of the prosecution, constituted ineffective assistance of counsel, which deprived him of a fair trial.
 {¶ 69} The tests involved placing blood samples on pieces of leather and glass, allowing it to dry, and then wiping the leather and vinyl with Armor-All or water, and then testing the glass and leather for the presence of blood. Bennett maintains that defense counsel's failure to object prejudiced him, since (1) Nock's qualifications as an expert witness regarding the effect of Armor-All on blood stains had not been established; (2) the tests were performed on leather, rather than vinyl, when Bennett's truck had a vinyl interior, and that Nock was permitted to testify that leather was more porous than vinyl, when his qualifications as an expert on the comparative absorptive qualities of leather and vinyl had not been established, and (3) the tests were conducted within one week of the start of the trial, thus precluding the defense from obtaining their own expert in crime scene investigation, or to request a continuance in order to and have their own series of tests performed.
 {¶ 70} This court has held that a failure to object, standing alone, is insufficient to sustain a claim of ineffective assistance of counsel.State v. Babbitt (Sep. 30, 1999), 11th Dist. No. 98-A-0109, 1999 Ohio App. LEXIS 4638, at *12 (citations omitted). Furthermore, a failure to object may be justified solely as a tactical decision. Gumm,73 Ohio St.3d, at 428.
 {¶ 71} As a practical matter, the State never offered Nock as an expert on the effect of Armor-All or water on blood stains; however, they did provide ample foundation into Nock's qualifications to test for blood and blood residue on numerous items. The Supreme Court of Ohio has stated that "a witness may qualify as an expert by reason of his or her `specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony.'" State v. Foust,
105 Ohio St.3e 137, 2004-Ohio-7006, at ¶ 76 quoting Evid.R. 702(B). Special education and certifications are not required to confer expert status, all that is required is that "the knowledge he or she possesses will aid the trier of fact in performing its fact-finding function." Id. (citations omitted). Given the strong presumption that counsel's performance constitutes reasonable assistance, we cannot find that counsel was ineffective in failing to challenge Nock's qualification as an expert witness. Furthermore, we fail to see where this testimony was prejudicial, as it was not probative of Bennett's guilt or innocence. This argument is without merit.
 {¶ 72} Bennett also argues that had defense counsel effectively assisted him, they would have engaged an expert in crime scene investigation in order to rebut the findings of Nock's tests or investigate their scientific reliability and accuracy. The Supreme Court of Ohio has held that the State is required to provide funds to an indigent criminal defendant to obtain expert assistance at state expense where the court finds the defendant has made a particularized showing "(1) of a reasonable probability that the requested expert would aid in his defense, and (2) that denial of the requested expert assistance would result in an unfair trial." State v. Nields, 93 Ohio St.3d 6, 11, 2001-Ohio-1291, citing State v. Mason, 82 Ohio St.3d 144, 1998-Ohio-370, at syllabus. In our review of the record before us, we find no evidence that Bennett ever requested funds to hire an expert in crime scene investigation. Furthermore, this court has held that defense counsel's failure to call an expert and instead rely on cross-examination does not constitute ineffective assistance of counsel. Babbitt, 1999 Ohio App. LEXIS 4638, at *13-*14 citing State v. Thompson (1987), 33 Ohio St.3d 1,10-11; State v. Tibbets, 92 Ohio St.3d 146, 167-168, 2001-Ohio-132
("[c]ounsel is not ineffective for choosing, for tactical reasons, not to pursue every possible trial objection"). This argument is, therefore, without merit.
 {¶ 73} Bennett next argues that defense counsel was ineffective, because counsel failed to object to alleged hearsay testimony by Detective Moisio, which described Bennett as a child and spousal abuser. In our careful review of the record of Moisio's testimony, we could find no mention of any statement implying that Bennett had assaulted Dorothy or that he had thrown Tessa, contrary to Bennett's assertions. In fact, any mention of "abuse" during this testimony consisted solely of references by defense counsel on cross-examination to rebut the content of Moisio's report of the initial interview with Dorothy. Therefore, we find no instance where defense counsel would have had occasion to object on these grounds. This argument is also without merit.
 {¶ 74} Bennett finally argues that counsel was ineffective in their failure to file a motion to suppress his statements made to Zimmerman when he was in custody. This court has held that, while "a criminal defendant's constitutional right to effective assistance of counsel does not require an attorney to file a motion to suppress in every case * * * where there exists reasonable grounds for filing a motion to suppress,
counsel's failure to file the motion may constitute ineffective assistance and warrant reversal." State v. Belknap, 11th Dist. No. 2002-P-0021, 2004-Ohio-5636, at ¶ 19 (citation omitted). Since Bennett's statement was voluntary, there were no reasonable grounds for moving to suppress it. This argument is also without merit. For all of the foregoing reasons, we find Bennett's third assignment of error to be without merit.
 {¶ 75} In his fourth assignment of error, Bennett argues that the cumulative errors made by the trial court, and trial counsel's rendering of ineffective assistance, denied appellant a fair trial. The Supreme Court of Ohio has held that "multiple errors, that are separately harmless may, when considered together, violate a person's right to a fair trial." State v. Goff, 82 Ohio St. 3d, 123, 140, 1998-Ohio-369. We find that while there were errors made by the trial court with respect to both the admission of the knives and the hearsay testimony of Moisio, these are not sufficient, in light of the other evidence adduced at trial, to undermine confidence in the jury's verdict. Moreover, we find, in our review of the record that Bennett received aggressive and effective defense counsel. "[E]rrors cannot become prejudicial by sheer weight of numbers." State v. Bryan, 101 Ohio St.3d 272, 2004-Ohio-971, at ¶ 211 (citation omitted). Bennett's fourth assignment of error is, therefore, without merit.
 {¶ 76} For the foregoing reasons, the judgment of the Ashtabula County Court of Common Pleas is affirmed.
O'Neill, J. Rice, J. concur.