[Cite as *State v. Long*, 2014-Ohio-4416.]

**IN THE COURT OF APPEALS**

**ELEVENTH APPELLATE DISTRICT**

**LAKE COUNTY, OHIO**

| | | |
|---|---|---|
| STATE OF OHIO, | **:** | **O P I N I O N** |
| Plaintiff-Appellee, | **:** | |
| - vs - | **:** | **CASE NO. 2013-L-102** |
| STACEY R. LONG, | **:** | |
| Defendant-Appellant. | **:** | |

Criminal Appeal from the Lake County Court of Common Pleas, Case No. 13 CR 000241.

Judgment: Affirmed.

*Charles E. Coulson*, Lake County Prosecutor, and *Karen A. Sheppert*, Assistant Prosecutor, 105 Main Street, P.O. Box 490, Painesville, OH 44077 (For Plaintiff-Appellee).

*Matthew C. Bangerter*, P.O. Box 148, Mentor, OH 44061 (For Defendant-Appellant).

THOMAS R. WRIGHT, J.

{¶1} This appeal is from the Lake County Court of Common Pleas. Stacey Long was convicted by a jury of kidnapping, a first-degree felony in violation of R.C. 2905.01(A)(3), felonious assault, a second-degree felony in violation of R.C. 2903.11(A)(1), and domestic violence, a third-degree felony in violation of R.C. 2909.04(A)(1). On appeal, Long challenges the admission on an alleged hearsay statement, the trial court's denial of his motion for substitute counsel, the sufficiency and manifest weight of the evidence, whether his convictions of kidnapping and

felonious assault merge for sentencing purposes and whether his sentence is contrary to law. For the following reasons, we affirm.

{¶2} On Thursday March 7, 2013, Donna Palmatier went to Wendy's at about 7:30 p.m. with Marilyn Price and her daughter. The three of them stayed there for about an hour and a half. Price testified that during their trip, Palmatier did not have bruises on her face and that Palmatier had a regular demeanor. Price dropped Palmatier off at Palmatier's residence at some point between 9:15–10:00 p.m.

{¶3} The rooms in Palmatier's third-floor apartment are organized as the following. Upon entering the apartment to the right is a full bathroom, and further back is a bedroom. To the left of the entrance is the kitchen. In the back of the apartment is a large living room, and at the very back of the living room is a sliding glass door that leads to a balcony. At some point after Palmatier arrived at her apartment, Long, who resided and was in a romantic relationship with Palmatier, entered and demanded that Palmatier make him a hamburger. When Palmatier refused, Long said that he could find someone else to make the hamburger. In turn, Palmatier suggested to Long that he leave the key to her apartment and find that other person. Palmatier then went to the bedroom.

{¶4} Shortly thereafter, in the bedroom, Long approached Palmatier and started pulling her hair. Palmatier attempted to flee from him and to use her cell phone to call the police. Palmatier made it either to her bedroom door or the front door; however, Long closed the door, grabbed her phone and threw the phone away. The phone landed on the floor resulting in the battery coming out. Long then proceeded to pick her up, throw her and slam her head into the couch in the living room. Palmatier

was unsure whether Long picked her up and threw her before he slammed her head into the couch.

{¶5} Long tore Palmatier's pants off, pulled her sweatshirt over her head, and punched her three times in the head. Long then "took" her to the balcony and said he was going to throw her off it, and that she would land on his friend's truck resulting in her becoming severely disabled. Palmatier testified that she constantly struggled to prevent Long from opening the sliding door leading to balcony. Palmatier was able to escape and ran toward the dining room table, but only made it to the kitchen floor. While she was on her stomach on the kitchen floor, Long pulled her toward himself, sat on top of her holding a knife and said, "I could cut your jugular vein. Look up because this is the last you're going to see." Palmatier continued to struggle to get away from Long. Eventually, Palmatier turned to face him and asked, "What do you want me to do? I'll do anything you want me to do." Long replied by proclaiming, "This is what I could do to you." He then moved the knife to her chest.

{¶6} Long helped her to her feet, put an icepack on her head and moved her to the bedroom where she could lay down. Palmatier testified that at this point her head felt like lead and she was unable to move her head. Long told her that she could call the police now; however, Palmatier did not call the police because she was afraid of provoking Long again. When Palmatier told Long that she thought that she had a concussion, Long told her that she did not have one because he intentionally hit her in locations that would not lead to a concussion.

{¶7} Upon waking in the morning on Friday March 8, Palmatier was lethargic and could not move her head. At some point, Palmatier sent a text message to her daughter Amy Beauchamp telling her that she was not feeling well and that therefore

3

Beauchamp should not pick her up. Beauchamp was planning on driving Palmatier back to Michigan to babysit Beauchamp's children for the weekend. When Beauchamp called and asked if she could stop by Palmatier's apartment and visit, Palmatier rebuffed her.

{¶8} Concerned, Beauchamp went to the Willowick Police Department and asked them to check on her mother. Officers Gregory Williams and Chris Olp accompanied Beauchamp to her mother's apartment. Long answered the knock on the door; however, when Beauchamp looked inside the apartment, she saw her mother with bruises on her face and asked, "What happened to you?" Beauchamp began to cry and yell. Consequently, the police told her to wait outside the apartment.

{¶9} After separating Long and Palmatier, Officer Williams asked Palmatier how she received her injuries. Palmatier was not forthcoming with details about her injuries, but she packed some items into an overnight bag and then left the apartment with the police officers and Beauchamp. Upon reaching the outside where the lighting was better, both Beauchamp and Williams realized Palmatier's injuries were more extensive than previously realized. The pictures taken by police reveal swelling around both eyes, with the left eye having a bad bruise that extends well beyond the perimeter of her eye socket. The pictures also revealed bruising around the left check and the right eye has also sustained bruising.

{¶10} When Officer Williams asked Palmatier if she wanted to press charges, Palmatier replied that she did not. She also indicated that she did not want medical care. Beauchamp however indicated that she believed her mother looked dazed and that she was at risk of falling. Beauchamp eventually persuaded her mother to visit the hospital; however, the police requested that Palmatier speak with them before going to

the hospital. At the police station, more pictures were taken where her left eye appears blood-red. Palmatier again refused to press charges and declined to provide a written statement to the police. Officer Williams testified that it did not surprise him that a victim of domestic violence would not want to file charges.

{¶11} Eventually, Palmatier was taken to Lake West Hospital. When doing intake triage, Palmatier told Adam Ridenour, an emergency room nurse, that she was suffering from dizziness and that she could not tell if she had lost consciousness. Ridenour indicated that an inability to distinguish whether one lost consciousness is usually an indication that the person had lost consciousness. When he asked more about the injuries, she told him that she was assaulted by her boyfriend by being pushed down and repeatedly punched. Ridenour testified that Palmatier complained of back pain and rib pain. Ridenour further testified that when he asked Palmatier to rate her pain on a scale of one to ten, she said her current pain level was at an eight. During the worst part of her assault, she said her pain level was a 10.

{¶12} Dr. John Maxfield examined Palmatier. He testified that her chief complaint was vertigo which started 18 hours before seeing him.[1] She also stated that her memory was failing her and she was somehow struck in the chest and she had been struck by a fist. Dr. Maxfield testified that Palmatier had two black eyes and some tenderness over the left check, left lateral chest wall tenderness, and midline tenderness on her neck. Dr. Maxfield indicated that Palmatier suffered a concussion from a blow to the head and a "probable rib fracture." Dr. Maxfield gave her meclizine for the vertigo and promethazine for the nausea, and told Palmatier to follow up with a

---

1. Maxfield examined Palmatier at some point in the late afternoon on Friday. Thus, 18 hours prior to his examination would be close to end of the day Thursday or early morning Friday.

doctor if her symptoms worsened. Palmatier would stay with at Beauchamp's house for several weeks. During her recovery, Palmatier testified she had difficulty breathing, sitting in certain positions, and could not wear a bra.

{¶13} At some point after the Lake County Prosecutor's Office became involved with the incident, Long sent Palmatier a letter that began as follows: "If you remember that affidavit I did for Mike and Cassy for one of their many situations, same thing. Simply state that "I, Stacey Long, did not harm or attempt to harm you on or about 3/7/13.' Anything you said contrary prior (sic) was under duress." The letter then instructed Palmatier how to properly notarize the statement with witnesses, told Palmatier to make three copies of the affidavit and send the copies to the clerk of courts. The letter also indicated that "another way" was for Palmatier not to sign for any certified mail and "just don't come." Because a bailiff would be sent to serve Palmatier, the letter asked her not to open up the door to unexpected guests. The letter closes by instructing, "If you end up here, simply state you don't remember and plead the fifth and state you were under duress when you spoke with the police. Throw this out after you read it." Palmatier disregarded the final instruction and handed the letter over to the prosecutor's office.

{¶14} The state also presented clips of phone calls that Long made from jail to his sister. The clips concern Long's desire for Palmatier not to participate in the proceedings. At one point Long acknowledges that his actions reflected misplaced anger that he took out on Palmatier. During their conversation his sister stated, "Yeah, she - you basically jacked her up so bad. I was just so hurt. Damn." Long replied, "Yeah, yeah, but like I said." In the last clip, Long states, "if she was to participate with these folks here, it would be a wrap, sis, you know?"

{¶15} Long did not present any witnesses or evidence, and he did not testify on his behalf. Rather, the defense sought to show that Palmatier's injuries were not serious. Specifically, the defense repeatedly procured testimony that she never called the police despite having access to the phone in a room where Long was not present and that she did not tell her daughter or the police what happened to her when they arrived at the apartment. Palmatier also testified that her injuries were not serious enough that she needed to go to the hospital before she gave a statement to the police and turned down the police's offer for an ambulance. Officer Williams testified that when he saw Palmatier she was not crying, hyperventilating or in obvious pain. Officer Williams further testified that Palmatier did not ask for any medical treatment, and was able to walk and speak and think clearly. Finally, Dr. Maxfield indicated that he only knew that the probable rib fracture occurred in the past six weeks, and that it was possible, though unlikely, that Palmatier's vertigo was caused by an upper respiratory infection.

{¶16} The sentencing court determined that the convictions for domestic violence and felonious assault merged for the purpose of sentencing; however, the court found that the convictions for felonious assault and kidnapping did not merge for sentencing purposes. The sentencing court imposed a ten-year sentence for kidnapping, a four-year sentence for felonious assault to be served concurrently, and notified Long that any post-release control would last for five years.

{¶17} As his first assignment of error Long asserts that:

{¶18} "The trial court erred to the prejudice of the Defendant-Appellant when it allowed the jury to hear prejudicial and unreliable evidence."

7

{¶19} Within this assignment of error, Long argues that the admission of his sister's statement "you basically jacked her up so bad[]" was impermissible hearsay that violates the rules of evidence and Sixth Amendment right to confront witnesses. The state argues that Long's reply to his statement of "Yeah, yeah * * *" makes the otherwise hearsay statement an adoptive admission. The state also contends that if the statement was hearsay, it was harmless error.

{¶20} "The admission or exclusion of relevant evidence rests within the sound discretion of the trial court." *State v. Sage*, 31 Ohio St.3d 173 (1987), paragraph two of the syllabus. The term "abuse of discretion" is one of art, "connoting judgment exercised by a court which neither comports with reason, nor the record." *State v. Underwood*, 11th Dist. Lake No. 2008-L-113, 2009-Ohio-2089, ¶30. When an appellate court is reviewing a pure issue of law, "the mere fact that the reviewing court would decide the issue differently is enough to find error[.] * * * By contrast, where the issue on review has been confined to the discretion of the trial court, the mere fact that the reviewing court would have reached a different result is not enough, without more, to find error." *State v. Beechler*, 2d Dist. Clark No. 09-CA-54, 2010-Ohio-1900, ¶67. Errors of law, however, are reviewed de novo. *State v. Loomis*, 11th Dist. Ashtabula No. 2002-A-0102, 2005-Ohio-1103, ¶8. Because Long's trial counsel failed to object to the admission of the alleged hearsay statement, he has waived all but plain error. *State v. Bennett*, 11th Dist. Ashtabula No. 2002-A-0020, 2005-Ohio-1567, ¶55.

{¶21} Evid.R. 801(C) defines hearsay as a "statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Hearsay evidence is generally inadmissible. Evid.R. 802. An adoptive admission is defined as "a statement of which the party has manifested an

8

adoption or belief in its truth" and is explicitly exempted from the definition of hearsay. Evid.R. 801(D)(2)(b). "In order for an adoptive admission to be applicable, the declarant must have made the statement in the presence of the party against whom the statement is offered at trial. In addition, the party must have heard and understood the statement, must have been free to disavow it, and must have either expressly acknowledged the truth of the statement or remained silent when a reasonable person would have denied its truthfulness." *State v. Comstock*, 11th Dist. Ashtabula No. 96-A-0058, 1997 Ohio App. LEXIS 3670, *13-14 (Aug. 15, 1997). The requirement that an adoptive admission take place in the presence of the party does not exclude phone conversations between the declarant and the party. *United States v. Woods*, 301 F.3d 556, 562 (7th Cir. 2002).

{¶22} Here, the declarant, Long's sister, made the statement in a phone conversation to which Long replied, "Yeah, yeah * * *." The recording was remarkably clear and there was no indication that Long could not hear or understand his sister. The tone of his voice in saying, "Yeah, yeah" signified that he was acknowledging the statement as true. Therefore, the statement could come in as an adoptive admission.

{¶23} Long further argues that the statement should have been excluded under Evid.R. 403(A) because the statement was "highly prejudicial and, without foundation, corroboration, or confrontation, [and] of no probative value whatsoever." He further argues that the statement was particularly prejudicial in this case because it was presented to the jury as an exhibit, thereby allowing the jury to repeatedly hear the statement during deliberations. Evid.R. 403(A) states that "[a]lthough relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury."

9

**{¶24}** Though Long notes that the prosecution emphasized the sister's statement twice in closing argument, the prosecutor's reference to the statement was always followed by Long's statement acknowledging the truth of the assertion. Therefore, the prosecution always used the statement as an adoptive admission, as opposed to an out of context hearsay statement. Furthermore, Evid.R. 403(A) only excludes evidence that is *unfairly* prejudicial to the defendant. This adoptive admission is damaging evidence against Long, but there is nothing unfair about its admission. The claim that the statements were uncorroborated is frivolous considering the testimony of the state's witnesses.

**{¶25}** Finally, the statement was properly authenticated. "Evid.R. 901 governs the authentication of demonstrative evidence, including recordings of telephone conversations. The threshold for admission is quite low, and the proponent of the evidence need only submit 'evidence sufficient to support a finding that the matter in question is what its proponent claims.' Evid.R. 901(A). '[T]he proponent must present foundational evidence that is sufficient to constitute a rational basis for a jury to decide that the primary evidence is what its proponent claims it to be.' *State v. Tyler*, 196 Ohio App.3d 443, 2011-Ohio-3937, 964 N.E.2d 12, ¶25, citing *State v. Payton*, 4th Dist. No. 01-CA2606, [2002-Ohio-508, 2002 Ohio App. LEXIS 496 (Jan. 25, 2002)]." *State v. Thompson*, 8th Dist. Cuyahoga No. 96929, 2012-Ohio-921, ¶27. "Identification of a voice, whether heard firsthand or through mechanical or electronic transmission or recording, by opinion based upon hearing the voice at any time under circumstances connecting it with the alleged speaker" is sufficient to authenticate a recording. Evid.R. 901(B)(5). Here, Palmatier identified the voices on the clips as belonging to Long and

his sister. Therefore, the recording was authenticated, laying the foundation for its admission.

{¶26} Consequently, the trial court did not err in admitting the sister's statement. The first assignment of error is without merit.

{¶27} As his second assignment of error, Long asserts that:

{¶28} "Defendant-Appellant was denied effective assistance of counsel in violation of the Sixth Amendment of the United States Constitution."

{¶29} In order to prevail on a claim of ineffective assistance of counsel, appellant must establish that: (1) the performance of defense counsel was seriously flawed and deficient; and (2) the result of appellant's trial would have been different if defense counsel had provided proper representation. *See Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). We are to be highly deferential in our review of trial counsel's performance. *Id.* at 689. Moreover, it is well-settled that counsel benefits from a strong presumption of competence. See *State v. Smith*, 17 Ohio St.3d 98, 100, 17 Ohio B. Rep. 219, 477 N.E.2d 1128 (1985). In other words, defense counsel is not ineffective unless his or her performance fell below an objective standard of reasonable representation, and the defendant is prejudiced from that performance. *State v. Bradley*, 42 Ohio St.3d 136, 143, 538 N.E.2d 373 (1989). Nevertheless, analysis of whether counsel's performance was deficient is not necessary if a claim can be disposed of by showing a lack of sufficient prejudice. *Id.*

{¶30} Here, Long asserts that his trial counsel's failure to object to the admission of the sister's statement discussed in the first assignment of error amounted to ineffective assistance of counsel. Because we found there was no error in admitting

11

the sister's statement, trial counsel was not deficient in failing to object to the statement. Consequently, the second assignment of error is without merit.

**{¶31}** As his third assignment of error, Long asserts that:

**{¶32}** "The trial court erred to the prejudice of the defendant-appellant when it denied his request for substitute counsel."

**{¶33}** "As a general proposition, an indigent criminal defendant does not have a constitutional right to choose the attorney who will represent him at the expense of the state; rather, he is only entitled to competent legal representation. *State v. Horn*, 6th Dist. No. OT-03-016, 2005-Ohio-5257, at ¶11. As a result, the request of a defendant to discharge his court-appointed counsel will be granted only if he can 'show a breakdown in the attorney-client relationship of such a magnitude as to jeopardize the defendant's right to effective assistance of counsel.' *State v. Coleman* (1988), 37 Ohio St.3d 286, 525 N.E.2d 792, paragraph four of the syllabus. *See, also, State v. Henness* (1997), 79 Ohio St.3d 53, 65, 1997-Ohio-405, 679 N.E.2d 686.

**{¶34}** "In applying the foregoing basic standard, the courts of this state have recognized three examples of good cause which would warrant the discharge of court-appointed counsel: (1) a conflict of interest; (2) a complete breakdown of communication; and (3) an irreconcilable conflict which could cause an apparent unjust result. *Horn*, 2005-Ohio-5257, at ¶11, quoting *State v. Blankenship* (1995), 102 Ohio App.3d 534, 558, 657 N.E.2d 559. In light of the nature of the three examples, it has been further held that the substitution of counsel should be allowed only if extreme circumstances exist. *State v. Glasure* (1999), 132 Ohio App.3d 227, 239, 724 N.E.2d 1165.

12

**{¶35}** "In regard to a possible breakdown of the attorney-client relationship due to a lack of communication, the Supreme Court of Ohio has expressly said that the Sixth Amendment right to counsel was not intended to guarantee that a criminal defendant will have a 'rapport' with his attorney. *Henness*, 79 Ohio St.3d at 65, citing *Morris v. Slappy* (1983), 461 U.S. 1, 103 S. Ct. 1610, 75 L. Ed. 2d 610. Accordingly, the existence of hostility or a personal conflict between the attorney and the defendant does not constitute a total breakdown so long as it does not inhibit the attorney from both preparing and presenting a competent defense. *State v. Meridy*, 12th Dist. No. CA2003-11-091, 2005-Ohio-241; *State v. Mayes*, 4th Dist. No. 03CA9, 2004-Ohio-2027. Moreover, the lack of communication must be permanent in nature before a finding of a complete breakdown can be made. *State v. Evans*, 153 Ohio App.3d 226, 2003-Ohio-3475, at ¶32, 792 N.E.2d 757. Finally, a dispute over the trial tactics or strategy of the attorney is not sufficient to establish the requisite breakdown." *Id. State v. Jackson*, 11th Dist. Trumbull No. 2004-T-0089, 2006-Ohio-2651, ¶43-45.

**{¶36}** Long filed two motions for ineffective assistance of counsel, and the trial court construed them as motions for substitute counsel. In the first motion, Long complained that his trial counsel waived his preliminary hearing and that decision deprived him of his opportunity to cross-examine Palmatier, that there was a procedure in the court system where he could waive his speedy trial rights in exchange for a reduced sentence, and that his trial counsel had been unsuccessful in obtaining a more desirable plea bargain from the prosecutor.

**{¶37}** At the hearing held on the motion, trial counsel explained that he waived the preliminary hearing because that was a way to reduce bond and to obtain the police report earlier. He also believed that the Palmatier was not present at the

preliminary hearing, thereby making the hearing pointless. As to Long's complaint concerning the speedy trial waiver/procedure, the trial court interpreted this complaint as Long seeking to be charged with an information instead of a grand jury indictment and informed Long that he had no right to have an information filed. The trial court also informed Long that he had no right to a plea bargain that satisfied him. Later in the hearing, Long clarified that the only reason he filed the motion was because he sought some information through discovery which he now possessed. He therefore withdrew the motion. When the trial court asked Long if he and his trial counsel could work together, he indicated that they could.

{¶38} In his second motion for ineffective assistance of counsel, Long complained that one of his conversations with his trial counsel resulted in an argument and that "Counsels (sic) inertia is deliberate and constitutes 'cruel and unusual punishment' creating additional fear and anxiety as he withholds his skills and knowledge to meet the case of the prosecution." He also complained that there was exculpatory evidence that his trial counsel was not seeking. Finally he complained that he had received a "minimal response" to his motions to the court and letters to trial counsel. Although his letters to trial counsel are not in the record, it appears that Long wrote several motions to the trial court, specifically (1) his objection to the state's motion for a continuance, (2) a motion to dismiss allied offenses of similar import, (3) a motion to dismiss the felonious assault charge as against the manifest weight of the evidence, (4) a request for various lesser-included offense jury instructions, and (5) a motion for exculpatory evidence through discovery.

{¶39} The trial court held a hearing on Long's second motion for ineffective assistance of counsel immediately before voir dire. At the hearing, Long claimed that

14

there was another statement of Palmatier's, besides her statement given to the police, that contained exculpatory information. The court and trial counsel were unable to ascertain what other statement Long was referencing as both the prosecution and trial counsel stated Palmatier only had one statement in the record. The trial court also permitted Long to make a statement for the record.

{¶40} In Long's statement, he alleged that his attorney was complicit in prosecutorial misconduct by not seeking medical information that would tend to exculpate Long for the felonious assault charge. He also alleged that his attorney withheld a statement by Palmatier. Finally Long complained that his attorney did not seek to collect phone records which could exonerate him of offenses in some way and that there was a nurse's statement that would exculpate him of some of the charges.

{¶41} Trial counsel replied that he had not withheld any information from Long and that trial counsel did not believe any exculpatory statements that Long referenced existed. As for the phone records, trial counsel indicated that he consulted with his supervisor and decided not to seek discovery on the matter. Trial counsel indicated that he could not go into more detail on the record due to his duty of confidentiality. The trial court then denied the motion for ineffective assistance of counsel, and either denied the remaining motions filed by Long or ruled they were moot.

{¶42} During the middle of trial, and outside the presence of the jury, Long indicated that he believed that he was going to be forced to testify, which would be prejudicial to his defense. The trial court replied that the decision on whether he had to testify had not come yet, because it was still the middle of the prosecution's case-in-chief. Long then requested that after the prosecution's case-in-chief he wanted to continue the trial pro se. The trial court denied the request as being untimely.

15

{¶43} Finally, after Long's trial counsel moved to acquit after the prosecution's case-in-chief, trial counsel and Long had a "heated" exchange as to whether Long would testify. Long indicated to the court that he was not going to testify. Long again discussed his dissatisfaction with trial counsel's decision not to obtain certain telephone records. When trial counsel asked for a moment to speak to his client in private, he indicated that he had met with his client alone at least 10 times and did not need someone in the room for his safety.

{¶44} Based on the totality of the circumstances, we find no abuse of discretion in denying the motion. From our perspective, trial counsel and Long at times had significant disagreements over trial strategy; however, such disagreements alone are insufficient to create a complete breakdown in the relationship. The third assignment of error is without merit.

{¶45} Because the next two assignments of error go to the sufficiency and manifest weight of the evidence, we review those assignments together. As his fourth and fifth assignments of error, Long asserts that:

{¶46} "The trial court erred to the prejudice of the defendant-appellant when it returned a verdict of guilty against the manifest weight of the evidence."

{¶47} "The trial court erred to the prejudice of the defendant-appellant in denying his motion for acquittal made pursuant to Crim.R. 29(A)."

{¶48} This court laid out the standard for sufficiency and manifest weight challenges in *State v. Schlee*, 11th Dist. Lake No. 93-L-082, 1994 Ohio App. LEXIS 5862, *13-15 (Dec. 23, 1994) as the following:

16

{¶49} "'Sufficiency' challenges whether the prosecution has presented evidence on each element of the offense to allow the matter to go to the jury, while 'manifest weight' contests the believability of the evidence presented. * * *

{¶50} "'[M]anifest weight' requires a review of the weight of the evidence presented, not whether the state has offered sufficient evidence on each element of the offense.

{¶51} "In determining whether the verdict was against the manifest weight of the evidence, '* * * the court reviewing the entire record, *weighs the evidence* and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'"

{¶52} Kidnapping under R.C. 2905.01(A)(3) is defined as the following: "No person, by force, threat, or deception, or, in the case of a victim under the age of thirteen or mentally incompetent, by any means, shall remove another from the place where the other person is found or restrain the liberty of the other person, for any of the following purposes: * * * To terrorize, or to inflict serious physical harm on the victim or another."

{¶53} Felonious assault under R.C. 2903.11(A)(1) is defined as the following: "No person shall knowingly do either of the following: (1) Cause serious physical harm to another or to another's unborn;"

{¶54} R.C. 2901.01(A)(5) defines serious physical harm to persons, in pertinent part as: "[a]ny mental illness or condition of such gravity as would normally require hospitalization or prolonged psychiatric treatment" or [a]ny physical harm that involves

17

some permanent disfigurement or that involves some temporary, serious disfigurement."

{¶55} As to the kidnapping conviction, Long claims that the evidence does not support kidnapping because all acts of kidnapping were incidental to the assault. Therefore this appears to be a merger issue that we will address in more detail in the sixth assignment of error. We therefore will delay our analysis of that argument. We simply note that the moving of Palmatier to the balcony where Long threatened to throw her off it and Long's decision to sit on top of her and threaten to kill her with a knife is sufficient to establish kidnapping. Although Long claims the lack of direct evidence, such as Palmatier's torn clothes and the knife Long used to threaten Palmatier, as well as Palmatier's concern for Long's well-being undercut her credibility, we find do not find these flaws make her an incredible witness as to all matters.

{¶56} Because Long consolidated his manifest weight and sufficiency arguments for his domestic violence and felonious assault convictions, we will also do the same. As to the domestic violence arguments, they are without merit. Although a jury found Long guilty of domestic violence, the trial court merged the domestic violence verdict with the felonious assault verdict at sentencing. Therefore, Long was never convicted of domestic violence because he was not sentenced on that count. *State v. Bush*, 11th Dist. Portage No. 2005-P-0004, 2006-Ohio-4038, ¶36.

{¶57} In regard to the felonious assault conviction, Long argues that there was insufficient evidence or weight demonstrating that Palmatier suffered serious physical harm as defined by R.C. 2901.01(A)(5). These arguments are without merit. The evidence showed that Palmatier suffered a significant bruising on her head and a concussion. A concussion is a mental condition that would normally require

18

hospitalization. Furthermore other courts have found a concussion with bruising satisfies the serious physical harm threshold. *State v. Burks*, 3d Dist. Seneca No. 13-05-36, 2006-Ohio-2142, ¶7, 22; *State v. Davis*, 8th Dist. Cuyahoga No. 81170, 2002-Ohio-7068, ¶22-23.

**{¶58}** Consequently, the fourth and fifth assignments of error are without merit.

**{¶59}** As his sixth assignment of error, Long asserts that:

**{¶60}** "The trial court erred to the prejudice of the defendant-appellant by failing to merge allied offenses of similar import."

**{¶61}** We conduct a de novo review of an allied offenses question. *State v. Williams*, 134 Ohio St.3d 482, 2012-Ohio-5699, ¶12. R.C. 2941.25 provides:

**{¶62}** "(A) Where the same conduct by a defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

**{¶63}** "(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them."

**{¶64}** In *State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314, a plurality of the Ohio Supreme Court announced a new two-part test to determine if two offenses were allied offenses of similar import. This court embraced and later adopted the lead opinion in *State v. May*, 11th Dist. Lake No. 2010-L-131, 2011-Ohio-5233; *see also State v. Oliver*, 11th Dist. Portage No. 2010-P-0017, 2012-Ohio-122, ¶129. The two-

19

part test requires a court to first "consider whether it is possible to commit the offenses by the same conduct" and then consider "whether the offenses were, in fact, committed by the same conduct: i.e., 'a single act committed with a single state of mind.'" *State v. Biondo*, 11th Dist. Portage No. 2012-P-0043, 2013-Ohio-876, ¶6. "If both questions are answered affirmatively, then merger is appropriate." *Id.*

**{¶65}** As to the first prong of *Johnson*, it is possible to commit kidnapping under R.C. 2905.01(A)(3) and felonious assault with the same conduct and the same state of mind. Thus, the next issue is whether the crime was actually committed by a single act with a single state of mind.

**{¶66}** As to the second prong, Long punched Palmatier three times in the head in the living room, dragged her to the sliding glass door leading to the balcony where he proceeded to threaten to throw her off the balcony. From there, Palmatier attempted to escape to the kitchen; however, Long pulled her body towards himself, sat on her and threatened her with a knife. From these facts, Long committed felonious assault and then proceeded to kidnap her. The dragging of Palmatier to the balcony was not connected to the assault because the evidence indicates Long punched Palmatier three times before dragging her to the balcony. Consequently, the kidnapping was not incidental to the assault, and therefore the crimes were not committed by a single act. Furthermore, because there is no evidence that Long assaulted Palmatier after they left the bedroom, Long's threats to Palmatier reflected an intent to terrorize rather than cause serious physical harm. Therefore, there is a separate animus to the kidnapping as well.

**{¶67}** The sixth assignment of error is without merit.

**{¶68}** As his last assignment of error, Long asserts that:

20

**{¶69}** "The trial court erred by sentencing the defendant-appellant to a term of imprisonment contrary to statute and where its findings were not supported by the record."

**{¶70}** Here Long asserts that the sentencing court did not consider Long's "[d]epression and other mental health issues" and that he expressed genuine remorse at sentencing. The state argues that the record supports the sentence.

**{¶71}** The parties both suggest that this court utilize the test announced in *State v. Kalish*, 120 Ohio St.3d 23, 2008-Ohio-4912 as our standard of review. This court, including this writer, has adopted *Kalish* as the standard of review for felony sentencing. *See, e.g.*, *State v. Finch*, 11th Dist. Portage No. 2013-P-0046, 2014-Ohio-1680. However, we now conclude that *Kalish* is no longer good law. Rather, we must use the standard of review as set out in R.C. 2953.08(G)(2). That provision states: "The appellate court may increase, reduce, or otherwise modify a sentence that is appealed under this section or may vacate the sentence and remand the matter to the sentencing court for resentencing. The appellate court's standard for review is not whether the sentencing court abused its discretion. The appellate court may take any action authorized by this division if it clearly and convincingly finds either of the following: (a) That the record does not support the sentencing court's findings under division (B) or (D) of section 2929.13, division (B)(2)(e) or (C)(4) of section 2929.14, or division (I) of section 2929.20 of the Revised Code, whichever, if any, is relevant; (b) That the sentence is otherwise contrary to law." R.C. 2953.08(G)(2). To explain why, we need to briefly explore the relationship among *Kalish*, *Apprendi v. New Jersey*, 530 U.S. 466 (2000) and *Apprendi*'s progeny.

{¶72} In *Apprendi*, the Supreme Court considered whether certain forms of judicial factfinding in sentencing violated a defendant's Sixth Amendment right to a trial by jury. The New Jersey sentencing scheme at issue subjected the defendant to a prison term of five to ten years for his unlawful possession of a prohibited weapon. However, if the sentencing judge found, by a preponderance of the evidence, that the defendant acted with a motive to intimidate a victim because of their race, religion, disability, gender or sexual orientation, the possible sentence that the sentencing judge could impose was raised to 10-20 years. The Supreme Court held this hate crime statute violated Apprendi's Sixth Amendment right to a trial by jury. *Id.* at 490. ("[A]ny fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.") In *Blakely v. Washington*, 542 U.S. 296 (2004), the Supreme Court clarified that the statutory maximum was the maximum sentence that could be imposed solely on the basis of the facts as presented by the jury or otherwise admitted by the defendant. 542 U.S. at 303-04.

{¶73} In *State v. Foster*, 109 Ohio St.3d 1, 2006-Ohio-856, the Ohio Supreme Court considered whether certain portions of Ohio's sentencing regime violated *Apprendi* in light of the ruling in *Blakely*. The court severed the unconstitutional aspects of Ohio's sentencing scheme and held that "trial courts have full discretion to impose a prison sentence within the statutory range and are no longer required to make findings or give their reasons for imposing maximum, consecutive, or more than the minimum sentences." *Id.*, ¶100. The court also noted that "[t]he appellate statute R.C. 2953.08(G), [which sets out the standard of review on appeal], insofar as it refers to the severed sections, no longer applies." *Id.,* ¶99.

22

{¶74} In *Kalish*, the Ohio Supreme Court had to consider whether R.C. 2953.08(G) was the standard of review for felony sentences in light of its holding in *Foster*. The Ohio Supreme Court noted that an abuse of discretion standard was clearly prohibited prior to *Foster*. *Kalish*, 2008-Ohio-4912, ¶9. However, because "a record after *Foster* may be silent as to the judicial findings that appellate courts were originally meant to review under R.C. 2953.08(G)(2)" the court adopted the two prong test in *Kalish*. *Id.*, ¶12.

{¶75} In *Oregon v. Ice*, 555 U.S. 160 (2009), the United States Supreme Court held that it was constitutionally permissible to require judicial fact-finding before imposing consecutive sentences. Although *Ice* overruled *Foster*'s holding that such a requirement violated *Apprendi* and *Blakely*, the Ohio Supreme Court held that *Ice* did not revive fact-finding for consecutive sentences. *State v. Hodge*, 128 Ohio St. 3d 1, 2010-Ohio-6320, ¶35.

{¶76} In 2011, the General Assembly passed 2011 Am.Sub.H.B. No. 86 ("H.B. 86"). That bill revived the judicial fact-finding for consecutive sentences and revived the R.C. 2953.08(G) standard of review. In Section 11 of H.B. 86, the General Assembly provided a statement of legislative intent for the revisions to those sections:

{¶77} "In amending division (E)(4) of section 2929.14 and division (A) of section 2929.41 of the Revised Code in this act, *it is the intent of the General Assembly to simultaneously repeal and revive the amended language in those divisions* that was invalidated and severed by the Ohio Supreme Court's decision in *State v. Foster* (2006), 109 Ohio St.3d 1, 2006 Ohio 856, 845 N.E.2d 470. The amended language in those divisions is subject to reenactment under the United States Supreme Court's decision in *Oregon v. Ice* (2009), 555 U.S. 160, 129 S. Ct. 711, 172 L. Ed. 2d 517, and

the Ohio Supreme Court's decision in *State v. Hodge* (2010), 128 Ohio St.3d 1, 2010 Ohio 6320, 941 N.E.2d 768, and, although constitutional under *Hodge, supra*, that language is not enforceable until deliberately revived by the General Assembly." (Emphasis added.)

{¶78} Therefore, because the legislative intent of H.B. 86 was to overrule parts of *Foster* and the General Assembly also re-enacted the standard of review for felony sentencing, it can be inferred that the General Assembly also sought to revive the standard of review for felony sentencing. Several district courts have reached the same conclusion. *State v. Bever*, 4th Dist. Washington No. 13CA21, 2014-Ohio-600, ¶9 (collecting cases from the First, Second, Third, Eighth, Tenth and Twelfth Districts). Consequently, from now on we will utilize R.C. 2953.08(G) as the standard of review in all felony sentencing appeals.

{¶79} In this case, Long argues that the sentencing court did not consider the relevant factors under R.C. 2929.12. We note though that the sentencing court is required to *consider* the R.C. 2929.12 factors. Such a consideration does not require the sentencing court to "'use specific language or make specific findings on the record in order to evince the requisite consideration of the applicable seriousness and recidivism factors (of R.C. 2929.12).'" *State v. Webb*, 11th Dist. Lake No. 2003-L-078, 2004-Ohio-4198, ¶10, quoting *State v. Arnett*, 88 Ohio St.3d 208, 215, 2000-Ohio-302, 724 N.E.2d 793. In *State v. Greitzer*, 11th Dist. Portage No. 2006-P-0090, 2007-Ohio-6721, ¶28, this court acknowledged its adoption of the pronouncement of the Ohio Supreme Court in *State v. Adams*, 37 Ohio St.3d 295, 525 N.E.2d 1361 (1988). The Ohio Supreme Court in *Adams* held: "[a] silent record raises the presumption that a trial court considered the factors contained in R.C. 2929.12." *Adams*, supra, paragraph

24

three of the syllabus. Moreover, in *State v. Cyrus*, 63 Ohio St.3d 164, 586 N.E.2d 94 (1992), the Ohio Supreme Court held that the burden is on the defendant to present evidence to rebut the presumption that the court considered the sentencing criteria. *Id.* at 166. Other courts of appeals have found that in order to rebut this presumption, "'a defendant must either affirmatively show that the court failed to [consider the statutory factors], or that the sentence the court imposed is "strikingly inconsistent" with the statutory factors as they apply to his case.'" *State v. Bigley*, 9th Dist. Medina No. 08CA0085-M, 2009-Ohio-2943, ¶14, quoting *State v. Rutherford*, 2d Dist. No. 08CA11, 2009-Ohio-2071, ¶34.

{¶80} In its sentencing entry, the sentencing court stated that it considered the R.C. 2929.12 factors. Long does not point to anything in the record that demonstrates that the sentencing court failed to consider the relevant statutory factors. Therefore he must demonstrate that the result is strikingly inconsistent with the record, which he cannot do. Palmatier's testimony about her injuries was not contested and Long's attempts to interfere with the prosecution's case indicate his remorse lacks sincerity.

{¶81} The last assignment of error is without merit.

{¶82} Accordingly, the judgment of the trial court is affirmed.

TIMOTHY P. CANNON, P.J., concurs,

COLLEEN MARY O'TOOLE, J., concurs in part and dissents in part with a Dissenting Opinion.

_____

25

COLLEEN MARY O'TOOLE, J., concurs in part and dissents in part with a Dissenting Opinion.

{¶83} I concur with the majority regarding the disposition of appellant Stacy Long's assignments of error Nos. 1 through 5 and No. 7. I respectfully dissent regarding assignment of error No. 6 regarding the trial court's failure to merge the sentences regarding the charges of felonious assault and kidnapping.

{¶84} The majority correctly states that it is possible to commit felonious assault and kidnapping with the same conduct and the same state of mind – thus satisfying the first prong of *Johnson*. This leaves us to consider whether both crimes were committed by a single act with a single animus.

{¶85} It is useful to consider the following guidelines to determine whether kidnapping and another offense of similar import are committed with a separate animus:

> (a) Where the restraint or movement of the victim is merely incidental to a separate underlying crime, there exists no separate animus sufficient to sustain separate convictions; however, where the restraint is prolonged, the confinement is secretive, or the movement is substantial so as to demonstrate a significance independent of the other offense, there exists a separate animus as to each offense sufficient to support separate convictions;
>
> (b) Where the asportation or restraint of the victim subjects the victim to a substantial increase in risk of harm separate and apart from that involved in the underlying crime, there exists a separate animus as to each offense sufficient to support separate convictions.
>
> *State v. Logan*, 60 Ohio St.2d 126 (1979), syllabus.

{¶86} The evidence in the record along with the testimony of the victim demonstrates that the felonious assault lasted the duration of the restraint, or vice

26

versa, depending on one's point of view. This was not, as the state argued in their brief, a case of prolonged restraint that included several episodes of felonious assault. Long first attacked Palmatier in the bedroom of the apartment. The assault then immediately continued into the living room, dining room and ended shortly thereafter in the kitchen. This was not a case of felonious assault followed by restraint or restraint followed by felonious assault: the two crimes occurred simultaneously over a relatively brief period of time.

{¶87} After he assaulted her, Long told Palmatier that she could call the police. Palmatier testified that she was concerned that calling the police might cause Long to assault her again, so she went to bed instead. While Palmatier's concern was reasonable under the circumstances, there is no evidence in the record that Long further restrained her after the assault ended.

{¶88} In this case the restraint was not prolonged, the confinement was not secretive, and the movement was not so substantial so as to demonstrate a significance independent of the felonious assault offense. Long's restraint of Palmatier did not subject her to a substantial increase in risk of harm separate and apart from that involved in the felonious assault. *Logan, supra.*

{¶89} Thus, I respectfully dissent, regarding this assignment of error.

27