[Cite as *State v. Kratochvill*, 2020-Ohio-7000.]

# IN THE COURT OF APPEALS

# ELEVENTH APPELLATE DISTRICT

# LAKE COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | **O P I N I O N** |
| Plaintiff-Appellee, | : | |
| - vs - | : | **CASE NO. 2019-L-088** |
| PAUL KRATOCHVILL, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal from the Lake County Court of Common Pleas.
Case No. 2018 CR 001090.

Judgment: Affirmed.

*Charles E. Coulson*, Lake County Prosecutor, and *Teri R. Daniel*, Assistant Prosecutor, Lake County Administration Building, 105 Main Street, P.O. Box 490, Painesville, OH 44077 (For Plaintiff-Appellee).

*Mark B. Marein* and *Steven L. Bradley*, Marein & Bradley, 222 Leader Building, 526 Superior Avenue, Cleveland, OH 44114 (For Defendant-Appellant).

TIMOTHY P. CANNON, P.J.

{¶1} Appellant, Paul Kratochvill ("Kratochvill"), appeals a judgment in the Lake County Court of Common Pleas, following a jury trial, sentencing him to a combined term of five years in prison, as well as ordering restitution. We affirm the trial court's judgment.

{¶2} Kratochvill was accused of defrauding and stealing from three elderly individuals; namely, Patricia Deveny ("Deveny"), Diana Hiser ("Hiser"), and David

Sparks ("Sparks").[1]  More specifically, Kratochvill was accused of misrepresenting himself as a licensed stockbroker and soliciting investments from his victims, which he deposited into a TD Ameritrade account in the name of his mother, Maureen Kratochvill. He falsely conveyed to the victims, among other things, that the investments were annuities safe from risk, but he ultimately ended up losing their money.

{¶3}  On October 31, 2018, the Lake County Grand Jury issued an amended Indictment, charging Kratochvill with two counts of securing writings by deception ("Count 3" and "Count 13"), felonies of the second degree, in violation of R.C. 2913.43(A).  Count 3 was with regard to Deveny and Count 13 was with regard to Hiser. Kratochvill was also charged with, but ultimately not convicted of, the following: (1) eleven counts of making false representations in the sale of securities; (2) eleven counts of purchasing or selling securities while engaging in illegal, fraudulent, or prohibited acts; (3) two counts of theft from a person in a protected class; (4) grand theft; and (5) telecommunications fraud.

{¶4}  On June 14, 2019, Kratochvill filed a Motion to Continue Trial or, Alternatively, to Prohibit Certain Testimony at Trial, requesting a continuance because Dr. Conomy, who was to testify regarding the impact Parkinson's disease would have on the credibility of Maureen Kratochvill as a witness, had passed away.  In the alternative, Kratochvill requested that his mother Maureen not be permitted to testify regarding alleged misconduct on the part of Kratochvill against Maureen.  The trial court denied the request for a continuance but ordered that Maureen would not be permitted to testify regarding the alleged misconduct.

---

1. Kratochvill was eventually found not guilty of the charges related to Sparks.

2

{¶5} A jury trial began on June 24, 2019. The state of Ohio presented various exhibits and called the following witnesses:

{¶6} Deveny testified that she met Kratochvill through her daughter, who was renting a room in a building he owned. Deveny and Kratochvill discussed financial matters, including her 401(k). Deveny knew Kratochvill to be a hardwood floor installer and building owner but also believed he was a licensed trader and/or investor based on their conversations regarding financial matters. Kratochvill told Deveny there were ways of investing money that "could create more of an income" for her when she retired, and he spoke with her about the mismanagement of her 401(k). This persuaded her to invest with him. Kratochvill did not tell Deveny there was a possibility she could lose money; to the contrary, he told her the money would be safe and generate income. Kratochvill told Deveny he "knew ways to get around" risks of investing money, and Deveny testified that she would not have invested with Kratochvill had she known she could lose her principal, undergo risk, or that her investment would be subject to fees or commissions.

{¶7} Deveny testified that Kratochvill told her he would be investing the money she gave him into the building he owned and a business he was starting, and that Kratochvill told her she "would be getting around $4,000 a month back in returns." On October 30, 2013, Deveny signed a written agreement with Kratochvill to invest $102,000.00 in exchange for $4,000.00 a month in payments for a term of 36 months.

{¶8} The state presented evidence that on October 31, 2013, Deveny wrote a check for $102,000.00 to TD Ameritrade Clearing, Incorporated for the benefit of Maureen Kratochvill. She obtained the money from a combination of cashing in her

401(k) and utilizing an equity line of credit on her home. Deveny testified that she believed her monthly payments would come from Kratochvill's renters. Further, Deveny's daughter made statements to her indicating that Kratochvill could make up any shortfall in payments with his father's annuity. Under the agreement, Kratochvill paid Deveny a total of $42,000.00 over the course of several months, but he ultimately ceased making payments.

{¶9} Hiser testified that she met Kratochvill in 2014 when he came to her home to provide an estimate for refinishing her dining room floor. At that time, they discussed finances and Kratochvill told her he was a licensed stockbroker. He said that for every $25,000.00 she invested, she would receive $1,000.00 a month for retirement. According to Hiser, Kratochvill said that her money was safe, "everything would be fine," and she could get the money back at any time. She invested $120,000.00, making $50,000.00 in payments after executing signed agreements in February and March 2014—similar to those signed by Deveny—which provided she would receive $1,000.00 per month for every $25,000.00 invested with Kratochvill. Hiser later made additional payments totaling $70,000.00 from May through July 2014. Kratochvill paid Hiser a couple thousand dollars at various times, but Hiser testified that she stopped hearing from him in the spring of 2015. In November 2015, she requested the return of all money invested but did not receive it.

{¶10} The written agreements with both Deveny and Hiser were titled, "Original Agreement," and they were introduced at trial.

{¶11} Leo Fernandez ("Fernandez"), a forensic accountant with the Ohio Division of Securities, investigated the accounts involved in this matter. He testified that

4

checks written by Deveny and Hiser were deposited into a TD Ameritrade account, made payable to "TD Ameritrade for the benefit of Maureen Kratochvill." Fernandez explained that the money in the account was "day traded" and "margin traded," which he described as similar to buying stock using a credit card. The account showed a loss of $328,428.51 for 2014. He also testified that Kratochvill had lost some of his own money trading with this account. On cross examination, Fernandez testified that he had not reviewed bank records relating to wire transfers authorized by Maureen Kratchvill that may have occurred into the TD Ameritrade account. The trial court, over Kratochvill's objection, refused to allow the presentation of evidence that Maureen Kratochvill authorized wire transfers on the TD Ameritrade account because the evidence was not presented to the state during discovery prior to trial.

{¶12} Jennifer Price ("Price"), the manager of fraud investigations for TD Ameritrade Financial Intelligence Unit, testified that in November 2015, she had received a report that a TD Ameritrade account in the name of Maureen Kratochvill had been opened without Maureen's authorization. The state also submitted an affidavit from Maureen Kratochvill, which Price authenticated, stating that she had not authorized the opening of the account. Price testified that this was the TD Ameritrade account into which Deveny and Hiser's funds had been deposited. Internal records linked a phone number and email address on this account to a separate business account for Kratochvill. Both accounts had also been accessed online by the same IP address.

{¶13} Peter Lee ("Lee"), a friend of Kratochvill, testified that the two men both shared an interest in stocks and trading. Lee assisted Kratochvill with advice for opening a "Thinkorswim" brokerage account to purchase stock options. Although Lee

5

did not confirm through testimony, the "Thinkorswim" brokerage account referred to the TD Ameritrade account discussed in previous testimony. Lee testified that he signed a document granting him access to Kratochvill's account to assist him with trading. He testified that the document opening a "Thinkorswim" account in Maureen Kratochvill's name, although it had his signature on the bottom, had not been signed by him. A recording of a call made to TD Ameritrade to discuss this account was played by the state, in which the caller identified himself as Lee. Lee testified that he had not called to discuss the account and that he recognized the voice on the recording as Kratochvill's.

{¶14} Maureen Kratochvill testified that she had never opened a TD Ameritrade account or an account through "Thinkorswim," and she confirmed that she signed an affidavit submitted to TD Ameritrade denying she opened the account. Maureen's sister and power of attorney, Michelle Leech, testified that she and Maureen spoke about the account and they "didn't know what this account was for * * * or what was going on with it."

{¶15} Harvey McCleskey ("McCleskey"), Deputy Attorney Inspector with the Ohio Division of Securities, testified regarding the investigation of Kratochvill. He reviewed the victims' agreements and determined they were investment contracts, which are considered a security. He testified that the agreements were similar to an annuity in that they were not to be subject to risk, although the funds ultimately were pooled and used for purchasing bonds and were lost through trading.

{¶16} At the end of the state's case-in-chief, the defense made an oral motion for acquittal under Criminal Rule 29, which was granted with regard to the single count of telecommunications fraud. The defense then called Thomas Geyer, a lawyer and

6

former employee and commissioner of the Division of Securities, who testified that the Original Agreements were not investment contracts because there was a guarantee of a return of funds; i.e., the agreements provided that the funds were not subject to risk. Therefore, Geyer concluded that the Original Agreements with Deveny and Hiser were not securities and could not be punishable under securities law. The defense then rested.

{¶17} On June 27, 2019, the jury found Kratochvill guilty of 2 counts of securing writings by deception—Count 3 and Count 13—and not guilty of the 25 remaining counts.

{¶18} A sentencing hearing was held on July 29, 2019, and the trial court ordered the following sentence for each charge:

> Count 3: Securing Writings by Deception (R.C. 2913.43(A)) (F-2) - 60 months served concurrently with count 13 and with restitution to be paid to Deveny in the amount of $70,614.00;
>
> Count 13: Securing Writings by Deception (R.C. 2913.43(A)) (F-2) - 60 months served concurrently with count 3 and with restitution to be paid to Hiser in the amount of $107,701.99.

{¶19} Kratochvill filed a timely notice of appeal and raises nine assignments of error for our review. For clarity and convenience, we combine and consider the assignments out of order.

{¶20} Kratochvill's fifth assignment of error states:

> [5.] The trial court erred in not granting a continuance in light of Dr. Conomy's death.

{¶21} Kratochvill argues he was denied due process of law as a result of the trial court not granting a continuance of his trial following the death of Dr. Conomy, who was going to proffer expert testimony regarding Parkinsonian delusions.

{¶22} "The Ohio Supreme Court has held '[t]he grant or denial of a continuance is a matter which is entrusted to the broad, sound discretion of the trial judge. An appellate court must not reverse the denial of a continuance unless there has been an abuse of discretion.'" *State v. Moore*, 11th Dist. Geauga No. 2014-G-3195, 2014-Ohio-5183, ¶54 quoting *State v. Unger*, 67 Ohio St.2d 65, 67 (1981). "An abuse of discretion connotes the trial court's '"failure to exercise sound, reasonable, and legal decision-making."'" *Id.*, quoting *State v. Beechler*, 2d Dist. Clark No. 09-CA-54, 2010-Ohio-1900, ¶62, quoting *Black's Law Dictionary* 11 (8th Ed.2004). "In considering whether a trial court abused its discretion when ruling on a motion for continuance, a reviewing court must weigh any potential prejudice to the defendant against the trial court's 'right to control its own docket and the public's interest in the prompt and efficient dispatch of justice.'" *Id.*, quoting *Unger*, *supra*, at 67.

{¶23} Here, the motion filed by Kratochvill before trial was multipart: a motion to continue or, in the alternative, a motion to limit testimony regarding Kratochvill's treatment of his mother. The trial court considered the motion, denied a continuance, and granted the alternative request, a limitation on testimony. The issue was also discussed in chambers before trial, and the trial court considered the content of what Dr. Conomy was going to proffer regarding the effects of Parkinson's Disease and medications for treatment on Kratochvill's mother. Given the extensive consideration of the motion and the granting of limitations on Kratochvill's mother's testimony, we cannot say that denying a continuance ten days prior to trial was an abuse of discretion. The trial court's ruling balanced the prejudice to Kratochvill, granted the requested restriction

on testimony in light thereof, and did not demonstrate a failure to exercise sound, reasonable, and legal decision-making.

{¶24} Accordingly, Kratochvill's fifth assignment of error is without merit.

{¶25} Kratochvill's third, fourth, and sixth assignments of error address evidentiary issues:

> [3.] Evidence regarding Maureen Kratochvill's uninvolvement with the Ameritrade account was improperly admitted.
>
> [4.] State's witness McCleskey's testimony regarding what was important to the investors in making their decision to enter the original agreement was improper.
>
> [6.] The trial court erred when it prohibited the defense from introducing evidence that Maureen Kratochvill, in direct contradiction of her testimony on direct examination, knew about the existence of the Ameritrade account.

{¶26} The standard of review on appeal regarding admission of evidence is varied. Generally, "'[t]he admission or exclusion of relevant evidence rests within the sound discretion of the trial court.'" *State v. Long*, 11th Dist. Lake No. 2013-L-102, 2014-Ohio-4416, ¶20, quoting *State v. Sage*, 31 Ohio St.3d 173 (1987), paragraph two of the syllabus. Abuse of discretion is defined as discussed above. An abuse of discretion may be found when the trial court "applies the wrong legal standard, misapplies the correct legal standard, or relies on clearly erroneous findings of fact." *Thomas v. Cleveland*, 176 Ohio App.3d 401, 2008-Ohio-1720, ¶15 (8th Dist.) (citation omitted).

{¶27} However, the trial court does not have discretion, for example, to admit hearsay "except as otherwise provided by the Constitution of the United States, by the Constitution of the State of Ohio, by statute enacted by the General Assembly not in

conflict with a rule of the Supreme Court of Ohio, by these rules, or by other rules prescribed by the Supreme Court of Ohio." Evid.R. 802; *see also Jack F. Neff Sand & Gravel, Inc. v. Great Lakes Crushing, Ltd.*, 11th Dist. Lake No. 2012-L-145, 2014-Ohio-2875, ¶23, citing *State v. DeMarco*, 31 Ohio St.3d 191, 195 (1987). Therefore, if it is a pure legal question, such as whether testimony constitutes inadmissible hearsay, we apply a de novo standard of review. *Id.*, citing *John Soliday Fin. Group, LLC v. Pittenger*, 190 Ohio App.3d 145, 150, 2010-Ohio-4861 (5th Dist.). In addition, if evidence is not objected to at trial, its admission is normally reviewed for plain error. *State v. Bennett*, 11th Dist. Ashtabula No. 2002-A-0020, 2005-Ohio-1567, ¶55 (applying plain error analysis to a failure to object to hearsay testimony at trial).

{¶28} Because each of these evidentiary challenges requires a different analysis and/or standard of review, we address them individually.

**Evidence regarding Maureen Kratochvill's lack of involvement with the Ameritrade account.**

{¶29} Kratochvill argues that evidence regarding whether Maureen Kratochvill was involved with the TD Ameritrade account was not relevant. In the alternative, Kratochvill argues the evidence should not have been permitted under Evid.R. 403(A) as unfairly prejudicial. We disagree with both contentions.

{¶30} "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401. Pursuant to Evid.R. 402, "[e]vidence which is not relevant is not admissible."

{¶31} Further, Evid.R. 403(A) states, "[a]lthough relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair

10

prejudice, of confusion of the issues, or of misleading the jury." The application of Evid.R. 403(A) was described by the Supreme Court of Ohio in *State v. Crotts*, 104 Ohio St.3d 432, 2004-Ohio-6550:

> "'Exclusion on the basis of unfair prejudice involves more than a balance of mere prejudice. If unfair prejudice simply meant prejudice, anything adverse to a litigant's case would be excludable under Rule 403. Emphasis must be placed on the word 'unfair.' Unfair evidence is that quality of evidence which might result in an improper basis for a jury decision. Consequently, if the evidence arouses the jury's emotional sympathies, evokes a sense of horror, or appeals to an instinct to punish, the evidence may be unfairly prejudicial. Usually, although not always, unfair prejudicial evidence appeals to the jury's emotions rather than intellect.'"

*Id.* at ¶24, quoting *Oberlin v. Akron Gen. Med. Ctr.*, 91 Ohio St.3d 169, 172 (2001), quoting Weissenberger, *Ohio Evidence*, Section 403.3, at 85-87 (2000); *accord State v. Craig*, 11th Dist. Lake No. 2016-L-113, 2017-Ohio-8939, ¶45.

{¶32} In the matter sub judice, Kratochvill was convicted of two counts, but 26 other charges were also prosecuted at the trial. Although he argues the testimony is irrelevant in relation to the charges of which he was convicted, several of the charges of which he was acquitted—including making false representations in the selling of securities—related to false representations regarding Maureen's involvement with the investment account used to trade the victims' funds. This testimony was directly relevant, and the trial court did not abuse its discretion in admitting it.

{¶33} Further, we disagree that Maureen Kratochvill's testimony should have been excluded as unfairly prejudicial under Evid.R. 403(A). We do not find any danger of unfair prejudice here, as the testimony was limited by the trial court to explaining the facts surrounding whether Maureen Kratochvill opened the account. The fact that this

11

testimony may portray Kratochvill in a negative light was highly unlikely to have aroused the jury's emotional sympathies rather than their intellect.

**McCleskey's testimony regarding what was important to investors.**

{¶34} Kratochvill argues Deputy Attorney Investigator McCleskey's following statement was based on hearsay: "I was able to determine that the investors' interest in making sure that Mr. Kratochvill was licensed wasn't met. Their interest in making sure that he had the authority to trade on the account of his mother wasn't met and also the securities probably should have been registered." The state argues that a plain error standard of review should be applied because Kratochvill did not object to the statement at issue during trial and further contends Kratochvill cannot demonstrate plain error.

{¶35} If a party fails to object to testimony at trial, the party forfeits all but plain error review on appeal. *See Bennett*, *supra*, at ¶55. Crim.R. 52(B) provides that "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." "In order for Crim.R. 52(B) to apply, a reviewing court must find that (1) there was an error, i.e., a deviation from a legal rule; (2) that the error was plain, i.e., that there was an 'obvious' defect in the trial proceedings; and (3) that the error affected 'substantial rights,' i.e., affected the outcome of the trial. *Bennett*, *supra*, at ¶56, quoting *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002). Although an appellate court may notice plain error under Crim.R. 52(B), such notice "is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *Long*, *supra*, at paragraph three of the syllabus.

{¶36} "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C).

{¶37} Here, no error is demonstrable because McCleskey did not recite any particular statement made by the victims. His testimony was attempting to explain that the potential concerns the victims had—such as Kratochvill's lack of a license and that the account was in his mother's name—were supported by the evidence he obtained in the investigation. This included the evidence that Kratochvill was not licensed, the securities were not registered, and the account was ultimately discovered to have been in his mother's name. The testimony primarily related to the focus of his investigation and not particular statements made by the victims.

{¶38} Even presuming McCleskey's testimony could be construed as hearsay for referencing statements the victims may have made, it was consistent with the testimony the victims had provided. Hiser testified that Kratochvill said he was licensed, and Deveny also expressed a belief that he was licensed, showing that they both had an interest in this fact. Further, both testified they believed Kratochvill had authority to utilize the account in which he put their payments, either because it was a joint account or because he had been granted the ability to do so through a power of attorney. In other words, the testimony in question corroborated facts already part of the record. Thus, even if hearsay, we conclude that any error in the admission of this testimony was harmless, as it did not affect Kratochvill's substantial rights. *See State v. Williams*, 38 Ohio St.3d 346, 350 (1988) (an error in the admission of evidence may be deemed harmless when cumulative and corroborative to testimony of other witnesses); Crim.R.

13

52(A) ("[a]ny error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded").

### Evidence that Maureen Kratochvill knew about the Ameritrade account.

{¶39} Kratochvill argues that the court erred by not allowing evidence that Maureen Kratochvill had signed for wire transfers into the TD Ameritrade account, contradicting her testimony that she did not open the account. He contends that the court erred in finding the evidence was not revealed to the prosecution in a timely manner because it did not become relevant until Maureen testified that she had no knowledge of the account and the defense had only retrieved the evidence the night before presenting it to the court.

{¶40} Kratochvill's counsel presented the evidence that Maureen Kratochvill had approved wire transfers on the third day of trial, during cross examination of Fernandez, the forensic accountant. The trial court found that it would be unfair to present this evidence for the first time on the third day of trial, noting the trial had been "set four times" and Kratochvill should have been aware of this evidence sooner. The trial court also emphasized that it had limited the state's ability—upon the defense's request—to question Maureen about concerns that Kratochvill had forced her to complete certain financial transactions.

{¶41} Crim.R. 16 requires that parties provide discovery when such a request is made. "The purpose of discovery rules is to prevent surprise and the secreting of evidence favorable to one party. The overall purpose is to produce a fair trial." *Lakewood v. Papadelis*, 32 Ohio St.3d 1, 3 (1987) (citation omitted). Crim.R. 16 "provides a range of sanctions which the trial court, in its discretion, may impose on a

14

noncomplying party." *Id.* at 4. Failure to comply with such rules may result in the court, inter alia, granting a continuance or prohibiting the party from "introducing in evidence the material not disclosed." Crim.R. 16(L)(1).

{¶42} Here, there is no question that although the state provided a discovery request, this evidence was not given to the state. The state had no advance notice that this evidence would be presented.

{¶43} Kratochvill argues that the evidence could not have been provided in discovery because it was not located until after the trial began, and, thus, it should have been admitted. However, as the trial court found, this evidence was available to the defense prior to trial. The Bill of Particulars clearly stated that Maureen's lack of knowledge of the account was part of several of the charges brought against Kratochvill. Nothing new was presented by the state at trial that would have suddenly led to the discovery of this evidence. Allowing such evidence to be admitted in these circumstances would be unfair to the state. At the point this issue was raised, Maureen, as well as other witnesses who discussed the issue of the account, had already testified. This issue was not brought up during their testimonies, thus hampering the state's ability to refute it.

{¶44} Kratochvill also argues that, presuming this was a discovery violation, exclusion of the evidence was a drastic remedy in light of the circumstances. Prior to imposing a sanction for failure to disclose evidence in discovery, the trial court should consider the circumstances surrounding the violation, including the extent to which the evidence would result in surprise or prejudice, the impact of excluding the evidence at trial, the willfulness of the violation, and the effectiveness of less severe sanctions.

15

*Papadelis*, *supra*, at 5.

{¶45}  In accord with *Papadelis,* the trial court did, in fact, conduct an inquiry into the circumstances surrounding the discovery violation.  The court determined that this evidence did surprise the state and could have been discovered and disclosed previously.  Contrary to Kratochvill's assertion, the fact that Fernandez was aware wire transfers occurred is different from the state having knowledge or evidence that Maureen Kratochvill had authorized such transfers.  Further, the late presentation of the evidence impacted the state's ability to effectively present its case.  The remedy of excluding the evidence also caused limited harm to Kratochvill because there was other evidence and testimony demonstrating deception in utilizing the TD Ameritrade account. Therefore, the trial court did not abuse its discretion in determining that this evidence should be excluded.

{¶46}  Based on all of the foregoing, Kratochvill's third, fourth, and sixth assignments of error challenging the trial court rulings on admission of evidence are without merit.

{¶47}  Kratochvill's first, second, seventh, and eighth assignments of error state:

> [1.]  The evidence is insufficient to sustain the conviction for count 3.
>
> [2.]  The evidence is insufficient to sustain the conviction for count 13.
>
> [7.]  The verdict in count 3 is against the manifest weight of the evidence.
>
> [8.]  The verdict in count 13 is against the manifest weight of the evidence.

16

{¶48} For the reasons that follow, Kratochvill argues that the evidence was insufficient to sustain either of his convictions and that the jury's verdicts are against the manifest weight of the evidence.

{¶49} Pursuant to Crim.R. 29(A), "The court on motion of a defendant or on its own motion, after the evidence on either side is closed, shall order the entry of a judgment of acquittal of one or more offenses charged in the indictment, information, or complaint, if the evidence is insufficient to sustain a conviction of such offense or offenses." Crim.R. 29(A) requires the trial court to grant a motion for judgment of acquittal if the evidence is insufficient to sustain a conviction on the charged offense(s). "Thus, when an appellant makes a Crim.R. 29 motion, he or she is challenging the sufficiency of the evidence introduced by the state." *State v. Patrick*, 11th Dist. Trumbull Nos. 2003-T-0166 & 2003-T-0167, 2004-Ohio-6688, ¶18.

{¶50} "A challenge to the sufficiency of the evidence raises a question of law as to whether the prosecution met its burden of production at trial." *State v. Bernard*, 11th Dist. Ashtabula No. 2016-A-0063, 2018-Ohio-351, ¶56, citing *State v. Thompkins*, 78 Ohio St.3d 380, 390 (1997) and *State v. Windle*, 11th Dist. Lake No. 2010-L-033, 2011-Ohio-4171, ¶25. "'In reviewing the record for sufficiency, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."'" *Id.*, quoting *State v. Smith*, 80 Ohio St.3d 89, 113 (1997), quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. Where there is insufficient evidence, a conviction will be vacated. *Id.* at ¶55, citing *State v. Rose*, 11th Dist. Lake No. 2014-L-086, 2015-Ohio-2607, ¶32.

17

{¶51} In determining whether the verdict was against the manifest weight of the evidence, "'[t]he court reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins*, *supra*, at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). A judgment of a trial court should be reversed as being against the manifest weight of the evidence "'only in the exceptional case in which the evidence weighs heavily against the conviction.'" *Id.*, quoting *Martin*, *supra*, at 175. "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a '"thirteenth juror"' and disagrees with the factfinder's resolution of the conflicting testimony." *Id.*, quoting *Tibbs v. Florida*, 457 U.S. 31, 42 (1982).

{¶52} There is a presumption that the findings of the trier of fact are correct, because the trier of fact has had the opportunity "to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984), citing 5 Ohio Jurisprudence 3d, Appellate Review, Section 603, at 191-192 (1978) ("* * * [I]n determining whether the judgment below is manifestly against the weight of the evidence, every reasonable intendment and every reasonable presumption must be made in favor of the judgment and the finding of facts. * * * If the evidence is susceptible of more than one construction, the reviewing court is bound to

18

give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment.").

{¶53} Kratochvill was found guilty of two counts of securing writings by deception in violation of R.C. 2913.43(A), which states: "No person, by deception, shall cause another to execute any writing that disposes of or encumbers property, *or* by which a pecuniary obligation is incurred." (Emphasis added.) The Indictment and Bill of Particulars track the language of the statute, specifically identifying the "writing" as the "original agreement."

{¶54} Kratochvill first argues that the written agreements with Deveny and Hiser giving rise to his convictions do not qualify as "writings" under the statute because they did not "create pecuniary obligations immediately after being signed." Kratochvill's position is that the agreements were executory contracts because "the triggering event for ensuing obligations" was Deveny and Hiser paying the money after the agreements were signed. Therefore, he argues execution of the agreement did not immediately incur a pecuniary obligation. His reliance on the term "pecuniary obligation" ignores the fact that the statute provides two circumstances by which the accused can violate R.C. 2913.43(A): by causing another to execute any writing (1) that disposes of or encumbers property or (2) by which a pecuniary obligation is incurred. The jury was instructed as to both circumstances. In addition, the jury was instructed with regard to an encumbrance as follows: "Encumbered means to make property subject to a charge, liability or burden, such as a mortgage, security interest, easement, restriction, limitation of use, lien or other obligation."

19

{¶55} Here, Deveny and Hiser executed agreements which contained a requirement that they "shall provide" specific amounts "as capital with [Kratochvill]." Deveny's agreement set forth an amount of $102,000.00, while the two agreements with Hiser resulted in her paying $50,000.00 and $70,000.00. Hiser's agreements also provided: "For every additional $25,000 of capital the monthly benefit increases by another $1,000" and that additional funds would "create a supplement to [the] existing original agreement." In return, the agreements provided that Kratochvill "shall provide" specified monthly payments. As a result of these agreements, both women made payments shortly after their execution.

{¶56} By the plain language of the statute and indictment, it is clear that Deveny and Hiser disposed of or encumbered their property—the funds paid to Kratochvill—when they wrote the checks pursuant to the agreements.

{¶57} Contrary to the position taken by the dissenting opinion, regardless of the circumstances in which R.C. 2913.43(A) has been typically utilized, there is no requirement in the statute that the writings dispose of or encumber the property immediately upon execution. For instance, in *Lemons*, the defendant was convicted of four counts of securing writings by deception for causing the victim to sign various documents. *State v. Lemons*, 8th Dist. Cuyahoga No. 101361, 2015-Ohio-2382, ¶43-51. The dissent notes that in one of these documents, the victim purchased a large interest in the defendant's company. *Id.* at ¶45. The other documents, however, were a "general power of attorney," appointing the defendant as power of attorney over the victim; a "pledge" document, which appointed the defendant and replaced the victim's mother as trustee of the victim's trust fund; and a document revoking the rights of the

20

victim's parents as special signatories on her bank account and removing her parents from all of her financial affairs. *Id.* at ¶44, ¶46, ¶47. While these documents gave the defendant "complete and unfettered access to [the victim's] accounts and trust fund," they did not immediately incur a pecuniary obligation or immediately dispose of or encumber the victim's property upon execution. Rather, it was under the terms of these documents that the defendant was able to dispose of and encumber the victim's property. *Id.* at ¶48. All four convictions were upheld on appeal. *Id.* at ¶51.

{¶58} The dissenting opinion further relies on *State v. O'Neill*, 10th Dist. Franklin No. 91AP-369, 1992 WL 63308 (Mar. 24, 1992), which is distinguishable from the facts at hand. In *O'Neill*, the defendant was charged with securing writings by deception for providing inaccurate information to a lender in order to obtain loans. The Tenth Appellate District identified the "difficulty in applying R.C. 2913.43 to the situations where a lender is alleged as the 'victim.'" *Id.* at *6. It explained there is a "serious problem with attempting to construe R.C. 2913.43 to apply to a situation where a bank or lender makes a loan based upon inaccurate information," because the defendant has merely caused a document to be prepared for signature, as opposed to causing "another" to "execute" a "writing." *Id.* Thus, that court held "the statute does not apply to penalize those who give inaccurate information to a lender, but is intended to penalize those who give inaccurate information to a person who takes out a loan or incurs an encumbrance on his or her property in reliance upon the inaccurate information." *Id.*

{¶59} Accordingly, Kratchovill's argument that the state did not present sufficient evidence of a "writing" under the statute is not well taken.

21

{¶60} Next, Kratochvill argues that the element of "deception" was not supported by sufficient evidence and that the jury's verdict was against the manifest weight of the evidence because Deveny and Hiser did not testify as to how they were induced by deception when executing the agreements. Specifically, Kratochvill argues that the element of deception was not demonstrated because the victims were aware of the risks; his use of an account in his mother's name was known to the victims at the time they signed the written agreements; and the loss of his own funds undercuts any evidence of deception.

{¶61} For the purposes of this element, as the jury was advised, "deception" means "knowingly deceiving another or causing another to be deceived by any false or misleading representation, by withholding information, by preventing another from acquiring information, or by any other conduct, act, or omission that creates, confirms, or perpetuates a false impression in another, including a false impression as to law, value, state of mind, or other objective or subjective fact." R.C. 2913.01(A).

{¶62} Testimony and evidence presented at trial demonstrated that Kratochvill engaged in deception as defined in the statute. Both victims testified that he represented to them their money would be "safe," "everything would be fine," and did not tell them that he would be trading their money or investing in stock. Deveny testified that she believed the money would be utilized, at least in part, as an investment in his building. The testimony created a reasonable inference that Deveny invested with Kratochvill because he convinced her that her current 401(k) investment was not being managed properly. Hiser testified that she was told she could get her money back upon request at any time. While the agreements stated "risk is inherent," it continued:

22

"However, due to good faith and risk management by both parties agree (sic) that through advance payment at a premium monthly rate of payments [i.e., the monthly payments made by Kratochvill] from guaranteed funds that are not risk related for capital provided that both parties agree they are bound to be mutually beneficial for their respective parts by and through every aspect of this agreement." In other words, the monthly payments were to be from funds not subject to risk. This ultimately was not the case, however, as the monthly payments owed by Kratochvill were not paid and the remaining capital was lost by Kratochvill.

{¶63} While Kratochvill argues that Deveny's belief she was guaranteed repayment due to an annuity he possessed was based solely on representations made by her daughter and not by him, this statement was unnecessary to prove deception given the evidence outlined above. Further, the fact that Kratochvill also lost money is irrelevant to whether he deceived the victims into thinking their money would be safe rather than traded in a manner that experts indicated put it at great risk.

{¶64} As to Kratochvill's argument that the victims were aware of the risks, their testimony indicated that they were told their money would be safe, their present investments were not beneficial, they could receive their money back at any time, and the money would not be subject to risk. Deveny testified that had she known the manner in which her money would be used, she would not have invested with Kratochvill.

{¶65} The circumstances surrounding the agreements also demonstrate Kratochvill's intent to deceive. Upon meeting Hiser for the first time to provide an estimate to refinish her dining room floor, he convinced her to invest $120,000.00.

23

Kratochvill told Hiser he was licensed in relation to investments, which was untrue. Further, Kratochvill used an account that was in his mother's name, which she later testified she had not opened, and evidence was presented and testimony taken confirming he had also misrepresented himself as another individual, Lee, in discussing this account with TD Ameritrade employees. These circumstances created a reasonable inference that Kratochvill was acting in a deceptive manner.

{¶66} The testimony and evidence outlined above are more than sufficient to support the element of "deception" as a matter of law. The jury was presented with overwhelming evidence from which they could reasonably conclude that Kratochvill committed the charged crimes. Accordingly, we do not find it was against the manifest weight of the evidence for the jury to determine that Kratochvill presented false or misleading information or created a false impression which was the basis for the victims' decision to execute the agreements and provide funds to him. *See Lemons*, *supra*, at ¶49-50 (securing writings by deception conviction was not against the manifest weight of the evidence when the defendant "preyed on [the victim's] emotions and manipulated her feelings," and "convinced her she could trust him" with her money and that "he was acting in her best interests"). The dissenting opinion is simply asserting its judgment in place of the jury, which observed all the testimony and evidence discussed above and was in the best position to determine whether to convict Kratochvill of the crimes.

{¶67} Kratochvill's first, second, seventh, and eighth assignments of error are without merit.

{¶68} Kratochvill's ninth and final assignment of error pertains to the order of restitution. It states:

24

[9.] The trial court awarded excessive restitution.

{¶69} Generally, this court reviews an order of restitution under the clearly and convincingly contrary to law standard found in R.C. 2953.08(G)(2). *State v. Ciresi*, 11th Dist. Geauga No. 2020-G-0249, 2020-Ohio-5305, ¶5. However, Kratochvill never objected to or questioned the amount of the award. "If a defendant does not object to the court's imposition of restitution at the sentencing hearing or request a hearing in order to dispute the order, the issue is waived on appeal save plain error." *State v. Whitman*, 11th Dist. Lake No. 2011-L-131, 2012-Ohio-3025, ¶21. As stated above, plain error shall only be noticed "under exceptional circumstances and only to prevent a manifest miscarriage of justice." *Long*, *supra*, at paragraph three of the syllabus.

{¶70} "'Prior to imposing a restitution order, a trial court must determine the amount of restitution to a reasonable degree of certainty, ensuring that the amount is supported by competent, credible evidence.'" *State v. Jones*, 11th Dist. Lake No. 2012-L-072, 2013-Ohio-2616, ¶11, quoting *State v. Coldiron*, 12th Dist. Clermont No. CA2008-06-062, 2009-Ohio-2105, ¶21. "The restitution ordered must 'bear a reasonable relationship to the actual loss suffered by the victim * * *.'" *Id.*, quoting *State v. Stamper*, 12th Dist. No. CA2009-04-115, 2010-Ohio-1939, ¶17.

{¶71} R.C. 2929.18 governs the issuance of financial sanctions on felony offenders. Subsection (A)(1) of that statute states, in pertinent part:

> (A) Except as otherwise provided in this division and in addition to imposing court costs pursuant to section 2947.23 of the Revised Code, the court imposing a sentence upon an offender for a felony may sentence the offender to any financial sanction or combination of financial sanctions authorized under this section * * *. Financial sanctions that may be imposed pursuant to this section include, but are not limited to, the following:

25

(1) Restitution by the offender to the victim of the offender's crime or any survivor of the victim, in an amount based on the victim's economic loss. * * *

{¶72} Kratochvill argues that the amounts awarded do not correspond to the victims' economic losses. He contends that Deveny testified she paid $102,000.00 to Kratochvill and was repaid $43,700.00, so her restitution award should have been $58,300.00 rather than $70,614.00. Similarly, Kratochvill argues that Hiser paid $120,000.00 and was repaid $32,000.00, thus restitution should have been $88,000.00 rather than $104,701.99.

{¶73} The trial court based its award of restitution on a review of the victim impact statements. Deveny's statement indicated that she had damages totaling $70,614.00, from the loss of her $102,000.00 investment (from her 401(k) and home equity line of credit) minus reimbursement, as well as taxes paid to the IRS in relation to this amount. Further, pursuant to Hiser's victim impact statement, she paid federal and state tax in an amount of over $15,000.00 in addition to her other losses. Hiser testified at trial that Kratochvill had promised to pay the taxes resulting from her use of stocks to pay her investment to him. Kratochvill does not present any argument as to why these amounts are not compensable economic losses resulting from his crimes. Hence, including these amounts in the order of restitution is not plain error.

{¶74} Kratochvill's ninth assignment of error is without merit.

{¶75} The judgment of the Lake County Court of Common Pleas is affirmed.


CYNTHIA WESTCOTT RICE, J., concurs,

MATT LYNCH, J., dissents with a Dissenting Opinion.

26

_____

MATT LYNCH, J., dissents with a Dissenting Opinion.

{¶76} I must dissent from the majority's determination that Kratochvill's convictions for securing writings by deception are supported by the weight and sufficiency of the evidence since the state failed to present evidence that fulfills the statutory requirements for this offense. While it is unfortunate that the money paid by Deveny and Hiser was lost through the investments Kratochvill made, it does not follow that his actions were a crime under the laws of this state.

{¶77} Pursuant to R.C. 2913.43(A): "No person, by deception, shall cause another to execute any writing that disposes of or encumbers property, or by which a pecuniary obligation is incurred." Kratochvill argues that he did not cause Deveny and Hiser to incur a pecuniary obligation, noting that they signed executory contracts and their payment was "the triggering event for ensuing obligations." The majority emphasizes that, regardless of whether a pecuniary obligation was incurred, Kratochvill was properly convicted because the first portion of the statute was met, i.e., that he caused another to "execute any writing that disposes of or encumbers property." A thorough examination of the statute and the facts of this case reveal that the state proved neither of these elements, nor did it demonstrate that Kratochvill's actions were deceptive.

{¶78} The term "pecuniary obligation" is not defined by the Ohio Revised Code, and, in fact, appears only in R.C. 2913.43. By their ordinary legal definitions, pecuniary means "of or relating to money" and obligation is "a legal or moral duty to do or not do

27

something" or a "formal, binding agreement or acknowledgement of a liability to pay a certain amount or to do a certain thing for a particular person or set of persons; esp. a duty arising by contract." *Black's Law Dictionary* 1167, 1104 (8th Ed.2004). In relation to the meaning of "pecuniary obligation," we note that the Legislative Service Commission comments enacting R.C. 2913.43 state: "This section is a restyled version of a former statute prohibiting obtaining a signature by false pretenses. It differs from the former section, however, in that it may involve instruments which dispose of or encumber property, as well as evidence of debt."

{¶79} While there is limited case law interpreting R.C. 2913.43(A), this statute has typically been utilized in circumstances where a defendant's deceptive actions result in the victim entering an agreement that encumbers real estate or otherwise incurring debt immediately upon executing an agreement. In *State v. Lenard*, 8th Dist. Cuyahoga No. 105998, 2018-Ohio-3365, ¶ 3-7, 37-41, the defendant's fraudulent statements caused the victims to sign a purchase agreement for a home. In *State v. Lemons*, 8th Dist. Cuyahoga No. 101361, 2015-Ohio-2382, ¶ 43-51, the defendant committed securing writings by deception when he manipulated the victim into signing various documents including one in which she purchased a large interest in the defendant's company. While the majority contends *Lemons* affirmed some convictions that were based on conduct that did not incur an immediate pecuniary obligation or encumbrance, at the time the pertinent documents were signed in *Lemons*, the defendant obtained complete and immediate access to the victim's bank account and trust fund. Unlike in the present matter, the "obligation" was not dependent upon future acts of the victim. In *State v. Wells*, 8th Dist. Cuyahoga No. 92130, 2009-Ohio-4712, ¶

28

19-24, 28, writings secured by deception obligated a lender to disburse loan proceeds. In each of these instances, a concrete, immediate, and binding contractual obligation and debt was incurred when the victim executed the writing that was secured by deception.

{¶80} In contrast to the foregoing cases, as Kratochvill accurately emphasizes, the agreements here were executory and did not create a definitive obligation solely by virtue of the parties signing them. This analysis applies both to the pecuniary obligation element of the statute as well as the disjunctive element of "executing a writing that disposes of" property.

{¶81} An executory contract has been defined as "'one in which a party binds himself to do, or not to do, a particular thing, whereas an executed contract is one in which the object of the agreement is performed and everything that was to be done is done.'" (Citation omitted.) *Cassella v. Tiberio*, 150 Ohio St. 27, 30, 80 N.E.2d 426 (1948). *Also Dispatch Printing Co. v. Recovery Ltd. Partnership*, 2015-Ohio-381, 28 N.E.3d 562, ¶ 32 (10th Dist.), citing *Black's Law Dictionary* 344 (8th Ed.2004) (an executory contract is one "that remains wholly unperformed or for which there remains something still to be done on both sides, often as a component of a larger transaction").

{¶82} The circumstances demonstrate that the victims did not incur a pecuniary obligation at the time they executed the agreements with Kratochvill since they were not *required* to make payments and Kratochvill would not have been able to recover if he had sued upon the agreements. Further, the writing did not dispose of or encumber any property. This is evident from an examination of the language of the agreements.

{¶83} The "original agreement" between Hiser and Kratochvill states that Hiser

"shall provide $50,000 as capital with" Kratochvill and that he shall make a monthly payment to Hiser as a benefit. However, its terms indicate that Hiser's failure to make the stated payment would not result in the contract being enforced to her detriment. The agreement states: "This is a 'simple' Agreement by definition: Party Jane Doe does 'X' and Party John Doe does 'Y', Party Jane [D]oe doesn't do 'X' and Party John Doe doesn't do 'Y.'" In other words, if Hiser chose not to make payment following the contract, it would simply relieve Kratochvill of his obligation to provide the monthly benefit. That payment was not required and no obligation was created at the time the agreement was signed is further buttressed by the agreement's provision that Hiser would pay $50,000 as capital but also that "for every additional $25,000 of capital the monthly benefit increases by another $1,000." This provided a means to enter into financial dealings but did not actually create a debt or obligation to Kratochvill. A second agreement entered into by the parties contained similar terms.

{¶84} Deveny's agreement was similar, but provided that she would pay $102,000 in exchange for the monthly benefit and it did not include the additional payment term. It contained the same "John Doe" language clause. Again, the contract was for a benefit upon payment but was not in the same vein as a debt incurred in the cases referenced above, where a loan was made with a requirement to be repaid or a property was purchased and the debt was immediately incurred. The fact that Deveny and Hiser ultimately chose to make payments under the agreements does not mean that such payments were "obligations" in a legal sense. We must apply the language of the statute for which Kratochvill was indicted and these circumstances do not fall under its terms.

30

{¶85} This analysis similarly applies to the majority's assertion that Kratochvill caused to be executed a writing disposing of or encumbering property. The writing did not actually dispose of or encumber property, but, instead, provided for future payment which Deveny and Hiser chose to make. While the victims ultimately did provide payment to Kratochvill, even presuming that is the type of property that was anticipated under the statutory language, the writing itself did not "dispose of" the property. The victims chose to provide the checks to Kratochvill after the agreement was executed. Further, if "a writing disposing of or encumbering the property" simply meant an agreement to make a payment (an interpretation not consistent with the terms of the statute), rather than the more common interpretation of creating an obligation such as executing a mortgage or selling a property, there would be no need to include the separate "pecuniary obligation" clause. *See Duncan v. Walker*, 533 U.S. 167, 174, 121 S.Ct. 2120, 150 L.Ed.2d 251 (2001) ("[w]e are * * * 'reluctan[t] to treat statutory terms as surplusage' in any setting") (citation omitted).

{¶86} It has also been emphasized that this statute must be construed "narrowly" and cannot encompass any situation where inaccurate information is given in conjunction with the parties' applications or negotiations for a loan but instead only where an actual obligation, such as receiving a loan or incurring an encumbrance on a property, is created. *See State v. O'Neill*, 10th Dist. Franklin No. 91AP-369, 1992 WL 63308, *6 (Mar. 24, 1992). "[S]ections of the Revised Code defining offenses or penalties shall be strictly construed against the state, and liberally construed in favor of the accused." R.C. 2901.04(A); *Painesville v. Kincaid*, 2015-Ohio-5532, 57 N.E.3d 152, ¶ 17 (11th Dist.); *also State v. Elswick*, 11th Dist. Lake No. 2006-L-075, 2006-Ohio-

7011, ¶ 42 (the rule of lenity "provides that ambiguity in criminal statutes is construed strictly so as to only apply to conduct that is clearly prescribed") (citations omitted).

{¶87} Although a conviction was not warranted under the statute for the foregoing reasons, it should be emphasized that there was also a lack of evidence to demonstrate the element of deception.

{¶88} Deception means "knowingly deceiving another or causing another to be deceived by any false or misleading representation, by withholding information, by preventing another from acquiring information, or by any other conduct, act, or omission that creates, confirms, or perpetuates a false impression in another, including a false impression as to law, value, state of mind, or other objective or subjective fact." R.C. 2913.01(A).

{¶89} The evidence presented demonstrates that Kratochvill intended to carry through with the terms of the agreements with Hiser and Deveny. He traded with both their funds and his own in order to make the profit necessary to complete the monthly payments. Both women testified that, after accepting their funds, Kratochvill had made payments to them. He did not abscond with their money or place it in a hidden account. Furthermore, Kratochvill lost funds of his own in the course of his trading, which, while not dispositive, shows he intended to earn profit from the investments, just as Deveny and Hiser also anticipated. This demonstrates not an intent to deceive but, rather, failure to effectively invest and trade. Without intent to deceive, a more appropriate remedy under such circumstances would be a civil lawsuit.

{¶90} Since the facts of this case do not satisfy the elements of the securing writings by deception statute, Kratochvill's convictions cannot be supported by the

32

weight or sufficiency of the evidence and should be reversed. Accordingly, I must dissent.